******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DEONDRE BOWDEN
## (SC 20488)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Kahn, Ecker and Keller, Js.

*Syllabus*

Convicted of numerous crimes, including felony murder, in connection with the shooting death of the victim, the defendant appealed to this court. Six days after the victim was found dead in a park with a gunshot wound to his head, the police stopped the defendant, who was driving the victim's missing vehicle, and found two of the victim's credit cards in the defendant's pocket. The defendant was arrested, and the police interviewed him and seized his cell phone. While incarcerated, the defendant asked his mother to dispose of the clothes that he was wearing on the night of the murder and asked his sister to dispose of a revolver that was stored at his grandmother's house. The police subsequently executed search warrants at the defendant's residence and his grandmother's house, where they recovered the clothing and the revolver, respectively. The police also obtained a search warrant to extract and search the data on the defendant's cell phone. Prior to trial, the defendant filed a motion to suppress the evidence obtained pursuant to that warrant. The trial court denied that motion, and, at trial, the state admitted evidence of call logs and text messages between the defendant and the victim, call logs and text messages between the defendant and another individual, B, and a photograph of a revolver. The defendant testified in his own defense, denying his involvement in the crimes and stating that, although he had been at the park with the victim, another individual, S, had shot the victim. S denied knowing the victim or being present at the park but testified that, because he did not own a cell phone, B occasionally let him use her phone. From the judgment of conviction, the defendant appealed to this court, claiming that the trial court improperly had denied his motion to suppress because the warrant authorizing the police to extract and search the contents of his cell phone lacked a particular description of the things to be seized and was not supported by probable cause. *Held* that the state satisfied its burden of demonstrating that any error with respect to the trial court's failure to suppress the evidence obtained pursuant to the search warrant was harmless, as such evidence either was not used by the state to implicate the defendant or was cumulative of other evidence, and, accordingly, this court affirmed the judgment of conviction: evidence regarding the phone calls and text messages between the victim's and the defendant's cell phones was otherwise available through the victim's cell phone records, which the police had obtained prior to interviewing the defendant, and the defendant admitted that those records accurately reflected the communications between them; moreover, even without those text messages, there was abundant video and testimonial evidence demonstrating that the defendant and the victim were together on the evening in question; furthermore, B's testimony about receiving certain text messages and phone calls from the defendant on the day in question rendered the evidence of those calls and messages cumulative, and the photograph of the revolver obtained from the defendant's cell phone was cumulative insofar as the revolver itself was introduced at trial; in addition, there was overwhelming evidence of the defendant's guilt, as the defendant was found driving the victim's car and in possession of his credit cards, which the defendant had been using since the victim's murder, video and testimonial evidence established that the defendant and the victim were together on the evening of the murder, the defendant requested that his sister and mother dispose of incriminating physical evidence, which demonstrated the defendant's consciousness of guilt and undercut his assertion that he was not involved in the charged crimes, and the defendant displayed a consistent lack of credibility by providing several contradictory versions of the events and by acknowledging that he had lied to the police.

Argued February 16—officially released August 9, 2022

Substitute information, in the first case, charging the defendant with the crime of larceny in the third degree, and substitute information, in the second case, charging the defendant with the crimes of murder, felony murder, robbery in the first degree, carrying a pistol without a permit, stealing a firearm, and criminal possession of a pistol or revolver, brought to the Superior Court in the judicial district of Fairfield, where the court, *E. Richards*, *J.*, denied the defendant's motions to suppress certain evidence; thereafter, the cases were tried to the jury; verdicts of guilty of larceny in the third degree, the lesser included offense of manslaughter in the first degree with a firearm, felony murder, robbery in the first degree, carrying a pistol without a permit, stealing a firearm, and criminal possession of a pistol or revolver; subsequently, the court vacated the findings of guilty of manslaughter in the first degree with a firearm and larceny in the third degree and rendered judgment of guilty in the second case of felony murder, robbery in the first degree, carrying a pistol without a permit, stealing a firearm, and criminal possession of a pistol or revolver, from which the defendant appealed to this court. *Affirmed*.

*Adele V. Patterson*, senior assistant public defender, with whom was *Shanna P. Hugle*, assistant public defender, for the appellant (defendant).

*Rocco A. Chiarenza*, senior assistant state's attorney, with whom, on the brief, was *Joseph T. Corradino*, state's attorney, for the appellee (state).

*Opinion*

KAHN, J. The defendant, Deondre Bowden, appeals from the judgment of the trial court convicting him of felony murder in violation of General Statutes § 53a-54c, robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), carrying a pistol without a permit in violation of General Statutes § 29-35, stealing a firearm in violation of General Statutes § 53a-212 (a), and criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1). On appeal, the defendant claims that the trial court's denial of his motion to suppress certain evidence from a search of his cell phone violated his rights under the fourth amendment to the United States constitution because (1) the application for the warrant authorizing that search lacked a particular description of the things to be seized,[1] and (2) the affidavit supporting that application failed to establish probable cause. The state disagrees with each of these claims and asserts, in the alternative, that any error was harmless. For the reasons that follow, we agree with the state that any error in the trial court's failure to suppress evidence obtained from the search warrant was harmless.[2] Accordingly, we affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found from the evidence admitted at trial, are relevant to our review of the defendant's claims. At approximately 9:25 p.m. on May 24, 2017, the police responded to a dispatch reporting "a victim [lying] in a roadway with blood everywhere" in the vicinity of Went Field Park in Bridgeport. The victim, who was later identified as LaWane Toles, was found with "a . . . large gunshot wound to his head" and was pronounced dead at the scene at 9:30 p.m.

During a subsequent investigation, the police determined that the victim's red Hyundai Sonata was missing and instructed officers to be on the lookout for that vehicle. At around 12:30 a.m. on May 30, 2017, Officer Victor Rodriguez noticed the Sonata being driven on Main Street in Bridgeport with its headlights turned off. Rodriguez called for backup and followed the Sonata until it stopped at an apartment building on Morgan Avenue. The defendant, the sole occupant of the Sonata, exited the vehicle and was placed under arrest for possessing a stolen motor vehicle. The defendant identified himself as Deondre Bowden.

Rodriguez searched the defendant following his arrest and found keys, a wallet, and two credit cards in his pocket. The wallet contained several items bearing the defendant's name, including his short-form birth certificate, social security card, health insurance card, official Connecticut state identification card, and bank card. The two credit cards in the defendant's pocket, however, bore the victim's name. When he saw the

credit cards in the victim's name, Officer Robert Pascone, who had arrived at the scene as one of the backup officers, stated, "well, this isn't you." In response, the defendant stated, "I know this looks bad."

Rodriguez testified that, while he was transporting the defendant to the police department, the defendant began to ramble, stating that he had received the car from his cousin, Dyshawn White, whom he said he had just dropped off at the train station. Police officers, upon investigation, were unable to locate any such individual. At the police department, the defendant gave a two and one-half hour long video recorded statement to the police, during which he offered several inconsistent accounts about both his familiarity with the victim and his whereabouts at the time of the crimes alleged.[3] At the end of this interview, the police seized the defendant's cell phone.

While the defendant was incarcerated at Bridgeport Correctional Center, his communications were monitored. Correctional authorities intercepted a letter in which the defendant informed his sister that "the thing [he] asked of [her] was/or is at [his grandmother's home] in [a] suitcase . . . ."[4] He also indicated in the letter that the suitcase was "[r]ed and [black]" and that "[t]he object [was] at the bottom in a [g]reen and white bag" and that he needed her to "check [out] that object . . . ." The police subsequently obtained a search warrant for the home of the defendant's grandmother in Norwalk and found a .44 Magnum Smith & Wesson revolver and two rounds of ammunition in two white and green plastic bags inside of a red and black suitcase.[5] During a subsequent investigation of the revolver, the police determined that it had been stolen from its original owner during a burglary on March 13, 2008. Further investigation revealed that the defendant did not possess a pistol permit, despite having that revolver in his possession.

Dollett T. White, the medical examiner responsible for the victim's autopsy, discovered three bullet fragments in the victim's head. The bullet fragments contained two gray lead fragments from the bullet itself and a fragment from a copper jacket. At trial, Marshall Robinson, a firearm and tool mark examiner, testified that the fragments found in the victim's skull were insufficient to permit him to make a comparison and to determine whether those fragments were consistent with a bullet fired from the revolver found in the defendant's suitcase at his grandmother's house. There were no shell casings recovered from the scene of the shooting. The jury was also presented with evidence that one of two bullets discovered in the revolver that was found inside of the defendant's suitcase was a lead bullet with a copper jacket. Marshall Robinson also testified that bullets with copper jackets are commonly available.

During his incarceration, the defendant spoke to his

mother on the phone, and, during that phone call, she told the defendant that the police were searching for his grey sweatpants and white T-shirt, the clothing the defendant had been wearing on the night of the victim's murder. In response, the defendant said "remember my . . . sweatpants . . . you know what the garbage can looks like," and "you know how to use it, right?" He then told his mother to "do that tomorrow." The police executed a search warrant at the defendant's residence on Morgan Avenue in Bridgeport and discovered a bag containing the defendant's clothing, as well as a debit card bearing the victim's name.

During the course of their investigation, the police also obtained a search warrant allowing them to conduct a data extraction to search all of the defendant's cell phone data. The cell phone data revealed call logs andtext messages between the defendant's and the victim's phones, as well as call logs and text messages between the defendant and an individual named Antanesha Brantley. Finally, the cell phone data also contained a photograph showing the .44 Magnum Smith & Wesson revolver.

The defendant was ultimately charged with, among other crimes, murder in violation of General Statutes § 53a-54a (a), felony murder in violation of § 53a-54c, robbery in the first degree in violation of § 53a-134 (a) (2), carrying a pistol without a permit in violation of § 29-35, stealing a firearm in violation of § 53a-212 (a), and criminal possession of a pistol or revolver in violation of § 53a-217c (a) (1).

The defendant filed a pretrial motion to suppress evidence obtained in connection with the search warrant that authorized the police to extract and search the data on his cell phone. The warrant affidavit contained multiple paragraphs detailing the evidence against the defendant, including the facts that he was found inside of the victim's stolen car after the murder, was found with several of the victim's credit cards, and gave multiple, conflicting stories to the police with respect to how and when he obtained possession of the stolen car. The affidavit also averred that the defendant told the police he had been with the victim at Went Field Park on the evening of the murder and how he had communicated with the victim via his cell phone just prior to the murder. The warrant contained a request for data extraction of the cell phone, including "incoming and outgoing calls, text messages, communicating applications, call identifier lists, contact lists, address book, pictures, videos and any information relative to the user's location during calls." The trial court heard argument on the defendant's motion to suppress and denied it in an oral decision.

At trial, Michael Summers identified himself in a still photograph taken from private video surveillance footage on Morgan Avenue approximately fifteen minutes

after the victim was shot. That image shows Summers and the defendant standing together outside of the victim's car. Summers testified that he had been with the defendant for only a short time that evening to smoke marijuana at the defendant's home. Summers stated that he did not know the victim and that he had not been to Went Field Park that evening. Summers also testified that he did not have a cell phone at the time but that, sometimes, Brantley, a friend of Summers, would let him use her phone.

After the close of the state's case-in-chief, the defendant testified in his own defense. He indicated that he spent time with the victim two to three times per week and that the victim was his drug dealer. The defendant stated that he had told Summers that he had a connection who could provide drugs and that Summers had indicated his desire to be informed the next time the victim was in town.

The defendant further testified that, on the day of the murder, the victim picked him up at around 4:45 p.m. According to the defendant, after a few hours, the two of them went to visit the victim's friends and family on Olive Street in Bridgeport. Video surveillance footage obtained from a nearby location depicted the defendant and the victim exiting the victim's car at approximately 8 p.m. The defendant testified that he eventually encountered Summers on Olive Street and that he, Summers, and the victim later left the area together in the victim's car.

The defendant testified that he, Summers, and the victim traveled to Went Field Park together and that, after they got there, he saw the victim get out of the car. The defendant told the jury that, as he was gathering his own belongings to leave, he overheard Summers saying, "[y]o, one of your pockets," indicating that it was a robbery. The defendant testified that he then heard a gunshot, saw the victim lying in the road, and that Summers then said, "oh, shit . . . the shit just went off." The defendant said he saw a black and silver .380 Cobra gun in Summers' hand. The defendant stated that he and Summers then got into the victim's car and drove off. After returning to his home on the evening of the murder, the defendant removed his belongings from the Sonata before driving it to a nearby housing project, where he parked the car and wiped it down. Over the next few days, he went back to the housing project and continued using the car. He discovered the victim's credit cards in the car and used them to buy liquor and other goods. The defendant denied that the gun found in the suitcase at his grandmother's home had been used to kill the victim or that he was involved in either the robbery or the victim's death. Rather, he continued to maintain that Summers had shot the victim and that he had no involvement in the crimes.

Following trial, the jury found the defendant not

guilty of murder but guilty of the lesser included offense of manslaughter in the first degree with a firearm. See General Statutes § 53a-55a. The jury also found the defendant guilty of, among other crimes, felony murder, robbery in the first degree, carrying a pistol without a permit, stealing a firearm, and criminal possession of a pistol or revolver.[6] The trial court subsequently rendered judgment of conviction and imposed a total effective sentence of fifty-five years of incarceration.

The defendant raises two claims in the present appeal, both related to the validity of the search warrant authorizing the police to extract and search the contents of his cell phone. First, he claims that the trial court erred in denying his motion to suppress the evidence obtained pursuant to the warrant because the warrant lacked a particular description of the things to be seized. Second, he claims that the trial court also erred in denying his motion to suppress that same evidence because the warrant was not supported by probable cause. The state argues that there was no error in the denial of the defendant's motion to suppress and, in the alternative, that any error was harmless beyond a reasonable doubt. Because we ultimately agree with the state that the admission of the evidence from the cell phone was harmless beyond a reasonable doubt, we need not decide whether the trial court committed error. Although we need not reach the issue of the challenge to the particularity of the cell phone warrant in the present case, we recognize that this claim raises an important issue that was also raised in *State* v. *Smith*, 344 Conn. 229,     A.3d     (2022), which we also decide today.

We begin with the applicable standard of review. "Whether any error is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless [beyond a reasonable doubt]." (Internal quotation marks omitted.) *State* v. *Armadore*, 338 Conn. 407, 437, 258 A.3d 601 (2021). Thus, we begin our analysis of harmlessness by placing the pieces of inadmissible evidence obtained from the defendant's cell phone in the context of the other evidence properly admitted at trial.

The evidence obtained from the defendant's cell phone data falls into five general categories. First, the state admitted evidence of twenty-two phone calls

exchanged between the victim and the defendant. Second, there were approximately one hundred text messages exchanged between the victim's and the defendant's cell phones. Third, there were eleven phone calls exchanged between Brantley's and the defendant's cell phones. Fourth, there were thirty-one text messages exchanged between Brantley's and the defendant's cell phones. Finally, there was a photograph introduced into evidence from the defendant's cell phone, showing the .44 Magnum Smith & Wesson revolver. We address each of these in turn.

We first consider the log showing twenty-two phone calls made between the victim's and the defendant's cell phones. Even if the record of those phone calls may have had an impact on the jury, the police had already obtained the victim's cell phone records by the time the defendant was interviewed by the police. From the victim's records, the police had access to the call logs made between the victim's and defendant's phones. See *State* v. *Correa*, 340 Conn. 619, 667–68, 264 A.3d 894 (2021) ("[i]ndependent source . . . means that the tainted evidence was obtained, in fact, by a search untainted by illegal police activity" (internal quotation marks omitted)). The police showed the defendant the victim's call log records when they interviewed him. The defendant identified his cell phone number and admitted to the accuracy of the communications between himself and the victim. Thus, even if the defendant's cell phone records were excluded from evidence, the jury still would have heard evidence about the same communications that were recovered from the victim's cell phone and the admissions of the defendant. Further, the same records were available from, and admissible through, the victim's cell phone records. Cf. *State* v. *Armadore*, supra, 338 Conn. 447 (defendant lacked standing to challenge evidence obtained from another individual's cell phone records).

The state's use of the text messages between the victim and the defendant was limited. The prosecutor asked the defendant about the text messages while he was testifying, particularly about certain references to drugs. The prosecutor also inquired about a series of text messages that seemed to indicate that the victim was picking up the defendant from his home on the day of the murder. Even without these communications, however, there was already abundant video and testimonial evidence showing that the defendant and the victim were together that evening. Specifically, video surveillance footage from Olive Street showed the defendant and the victim arriving together in the red Sonata to the gathering on that street on the evening of the murder. Further, two witnesses, who were in attendance at that gathering, testified that the defendant and the victim arrived together and stayed for less than one hour. The defendant also told the police, before they seized his cell phone, that he was with the victim

at Went Field Park shortly before the victim was murdered. In addition, the content of the text messages suggested that the defendant and the victim had a positive relationship. Rather than being harmful to the defendant's case, the defense, in closing, actually used these text messages to establish that the defendant and victim were friends in order to suggest a lack of motive.

The state also introduced evidence from the defendant's cell phone showing eleven phone calls and thirty-one text messages between Brantley and the defendant. At trial, Brantley testified that she, at times, permitted Summers to use her phone and that people would sometimes contact her to reach him. She also testified, however, that the last time she had seen Summers on the day of the victim's murder was around 2 p.m. Brantley testified about various phone calls and text messages that she exchanged with the defendant between 5 and 6 p.m. that day, during which the defendant asked Brantley to tell Summers that the defendant was with the victim.[7] Again, the defendant's proximity to the victim at the time of his death was undisputed at trial. Moreover, even if the records of those communications, which were stored on the defendant's cell phone, were excluded from evidence, Brantley was aware of the substance of those conversations and testified at trial about receiving those messages and calls from the defendant.

Finally, the state introduced a photograph of the .44 Magnum Smith & Wesson revolver obtained from the defendant's cell phone. The police had already found that specific firearm at the home of the defendant's grandmother after the defendant called his sister from prison and asked her to dispose of it. As such, the revolver itself was introduced at trial. As a result, that particular photograph was, in all relevant respects, clearly cumulative of other evidence presented at trial.

The cumulative and relatively insignificant nature of the evidence obtained from the defendant's cell phone must be viewed in contrast to all of the properly admitted evidence, which established a very strong case against him. The defendant was found inside of the victim's car and in possession of two of the victim's credit cards, which he had been using since the victim's murder. A subsequent search of the defendant's residence revealed an additional credit card bearing the victim's name. Videos and testimony offered by the state at trial, including the defendant's own testimony, firmly established that the defendant and the victim were together on the evening of the murder. These facts are compelling, particularly when viewed in combination with the defendant's requests that his sister and mother dispose of various items of incriminating physical evidence—including the likely murder weapon stored at his grandmother's home.

The defendant's assertion that he was not involved

in the crimes against the victim was also powerfully undercut by evidence demonstrating his consciousness of guilt. Most prominent, the defendant encouraged both his mother and his sister to throw away the clothing he had worn on the night of the victim's murder and to dispose of the revolver stored at his grandmother's home. See, e.g., *State* v. *Sivri*, 231 Conn. 115, 130, 646 A.2d 169 (1994) (attempted destruction of evidence showed consciousness of guilt). Further, the revolver that was recovered was the type of weapon that did not eject shell casings,[8] which was consistent with the lack of shell casings at the scene of the crime.

Finally, the defendant displayed a consistent lack of credibility by giving several contradictory versions of what happened on the evening in question. Initially, the defendant denied even knowing the victim, but, after giving many different versions of the events, he admitted that he was with the victim in Went Field Park on the evening of the murder. Although the defendant provided an account of the shooting that implicated Summers, the jury heard evidence of his prior inconsistent statements. During his testimony, the defendant repeatedly acknowledged that he lied to the police.[9] By its verdict, the jury clearly did not credit the defendant's testimony denying involvement in the crimes.

The phone calls, text messages, and the photograph of the revolver were either not used by the state to implicate the defendant or were cumulative of other evidence, and, because the state presented overwhelming evidence demonstrating the defendant's guilt, we conclude that the state has met its burden of showing that any error by the trial court in denying the defendant's motion to suppress was harmless beyond a reasonable doubt.

The judgment is affirmed.

In this opinion the other justices concurred.

[1] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment guarantee against unreasonable searches and seizures is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. *Mapp* v. *Ohio*, 367 U.S. 643, 655, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961).

[2] We note that this appeal raises the same issue regarding the particularity of cell phone warrants that was raised in *State* v. *Smith*, 344 Conn. 229, A.3d (2022), which we also decide today.

[3] For example, the defendant gave several different versions of how he obtained possession of the Sonata, whether and how he knew the victim, and his whereabouts on the night of the murder. In addition, he first told the police that he did not know the victim, eventually admitted to knowing the victim for almost a decade, and finally admitted to being with the victim in Went Field Park immediately prior to the murder.

[4] During a phone call from jail, the defendant asked his mother not to disclose his grandmother's address to the police.

[5] An investigation into the revolver revealed that it was operable and had previously been fired.

[6] The trial court vacated the jury's finding of guilt on the charges of

manslaughter in the first degree with a firearm and larceny in the third degree pursuant to *State* v. *Polanco*, 308 Conn. 242, 245, 61 A.3d 1084 (2013), and sentenced the defendant on the remaining counts of conviction.

[7] Brantley testified that she never saw Summers that evening and that she did not deliver that message.

[8] During his testimony, the defendant noted that a .380 Cobra pistol, like the one he claimed that Summers had used to shoot the victim, would have ejected a casing when fired. He acknowledged that a revolver, such as the one that was found in the suitcase at his grandmother's home, would not have ejected a casing when fired. We note that no casing or other ballistics evidence was found at the scene of the victim's murder.

[9] The defendant candidly remarked during trial that it was not his "job" to tell the truth, especially when "it's going to harm [him] . . . ."

———————————————————