# STATE OF CONNECTICUT *v.* DWAYNE SAYLES
## (SC 20575)

Robinson, C. J., and McDonald, D'Auria, Mullins and Ecker, Js.

*Syllabus*

Convicted of felony murder and conspiracy to commit robbery in the first
  degree, among other crimes, in connection with his role in the robbery
  of a convenience store and the shooting death of the store clerk, the
  defendant appealed to the Appellate Court, claiming, inter alia, that the

State *v.* Sayles

trial court had improperly denied his motions to suppress evidence of his cell phone and the data contained therein. The defendant and two other men, V and S, had driven to the convenience store in V's car. While V waited in the car, the defendant and S entered the store, robbed it of cash and cigars, and fatally shot the store clerk. V then drove S and the defendant to the defendant's apartment. V later contacted the police and identified the defendant and S in photographs taken from the store's surveillance footage, which showed that they were wearing masks and gloves. Subsequently, the police obtained and executed a search warrant for the defendant's residence, where they found a ski mask and a pair of gloves. The defendant was not present during the search but thereafter met with the police for an interview. Before the interview, the defendant gave his cell phone to his mother, who was sitting outside of the interview room. After the defendant invoked his right to counsel, a detective approached the defendant's mother and asked her for the defendant's cell phone, which she gave to the detective. The police subsequently obtained a warrant to search the contents of the cell phone. The evidence retrieved from the cell phone included a draft, unsent text message to an unknown recipient, in which the defendant stated, "[i]f I get locked up tell sheema put them shits in the river some where . . . ." At trial, there was testimony that "sheema" referred to the defendant's girlfriend, and the prosecutor argued during closing argument that "shits" referred to the gun used during the robbery. The state also elicited testimony from H, who had been incarcerated with the defendant during the defendant's pretrial custody. H testified that the defendant admitted that he and S both had shot the clerk during the robbery. The state further introduced into evidence a statement made to the police by J, a friend of the defendant who had been arrested for an unrelated crime. In that statement, J indicated that he had spoken to the defendant and S on the day of the robbery and that they had admitted to having shot the clerk. The Appellate Court upheld the judgment of conviction. In doing so, the Appellate Court rejected the defendant's claims that the police had violated his rights under *Miranda* v. *Arizona* (384 U.S. 436) and article first, § 8, of the Connecticut constitution when they continued to interrogate him after he had invoked his right to counsel, that the seizure of his cell phone violated the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution, and that the affidavit the police submitted in support of their application for a warrant to search the contents of his cell phone contained materially false information. On the granting of certification, the defendant appealed to this court, claiming, inter alia, that the Appellate Court had improperly upheld the defendant's conviction and that article first, § 8, of the Connecticut constitution mandates protection of a suspect's rights under *Miranda* via the adoption of a rule that evidence obtained through the questioning of a suspect

after the suspect has invoked the right to counsel must be suppressed and cannot be used in the state's case-in-chief at a subsequent trial.

*Held* that any error in the admission of the contents of the defendant's cell phone was harmless beyond a reasonable doubt, and, accordingly, this court declined to address the defendant's constitutional challenges and affirmed the Appellate Court's judgment:

A review of the trial record demonstrated that the state offered an overwhelming wealth of evidence beyond the contents of the cell phone to prove that the defendant had committed the crimes with which he was charged, including surveillance footage from inside of the convenience store, which depicted two perpetrators wearing hoodies, ski masks, and gloves, and the detailed testimony from V about his and the defendant's involvement in the events that occurred on the night of the robbery, and the consistency and independent corroboration of the various witnesses' testimony and statements rendered any error with respect to the admission of the contents of the cell phone harmless beyond a reasonable doubt.

Specifically, V's detailed testimony was corroborated by H's testimony that the defendant had admitted to the robbery and had provided him with numerous details about it, including that the defendant and another man both had guns and both had shot the clerk, that he wanted to get his cell phone excluded from evidence because it contained a photograph of the gun used in the robbery, that he was worried that the ski mask and gloves discovered by the police might have his DNA on them, and that he hid the gun at his girlfriend's house after the shooting but moved it once the police searched his residence, and V's testimony was also corroborated by J's statement to the police, which included details about the robbery that were not publicly available, such as the type of gun S used and the brand of cigars they stole.

Moreover, the state presented significant evidence of the defendant's consciousness of guilt, insofar as there was testimony from H that, after J gave his statement to the police, the defendant directed his cousin to assault J to force J to recant his testimony, and testimony from J himself that, after speaking to the police, he had a physical altercation with someone who had the same name as the defendant's cousin.

Furthermore, there was physical evidence corroborating the testimony and statements of V, H, and J, including the ski mask and gloves found during the search of the defendant's residence, testimony that an analysis of the DNA discovered on that ski mask indicated that the defendant was a potential contributor to that DNA, and testimony about the historical cell site location data associated with the defendant's cell phone, which established that that phone was in the areas of the convenience store and the defendant's residence at around the same times that, according to V's testimony, V, the defendant, and S were at those locations.

State *v.* Sayles

Although this court acknowledged that the testimony of V and H was properly viewed with some skepticism in light of their self-interest in testifying for the state as an accomplice and a jailhouse informant, respectively, the quality of their testimony grew in strength with the degree of independent corroboration.

In addition, even though the prosecutor mentioned the unsent text message several times during closing and rebuttal arguments, when viewed in context, the prosecutor's focus on the unsent text message was minimal relative to the other evidence admitted at trial, insofar as the prosecutor addressed the testimony of the various witnesses and the cell site location data before mentioning the contents of the cell phone and emphasized that other evidence far more strongly, and the contents of the cell phone played no role in establishing an element of an offense or in bolstering or destroying the credibility of any particular witness, which lessened the impact of any improper admission of the cell phone's contents.

(*One justice dissenting*)

Argued October 11, 2022—officially released March 26, 2024

*Procedural History*

Substitute information charging the defendant with the crimes of felony murder, conspiracy to commit robbery in the first degree, criminal possession of a pistol or revolver and carrying a pistol without a permit, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *B. Fischer, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Elgo*, *Alexander* and *Suarez, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed*.

*Dina S. Fisher*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Lisa M. D'Angelo*, executive assistant state's attorney, and, on the brief, *John P. Doyle, Jr.*, state's attorney, *Patrick J. Griffin*, former state's attorney, *Seth R. Garbarsky*, supervisory assistant state's attorney, and *Rocco A. Chiarenza*, senior assistant state's attorney, for the appellee (state).

State *v.* Sayles

*Opinion*

ROBINSON, C. J. A jury found the defendant, Dwayne Sayles, guilty of felony murder in violation of General Statutes § 53a-54c, among other offenses, in connection with his role in the robbery of a New Haven convenience store that resulted in the fatal shooting of the store clerk. The defendant now appeals, upon our grant of his petition for certification,[1] from the judgment of the Appellate Court affirming the judgment of conviction. *State* v. *Sayles*, 202 Conn. App. 736, 769, 246 A.3d 1010 (2021). On appeal, the defendant raises numerous constitutional challenges to the decision of the Appellate Court upholding the trial court's denial of his motions to suppress evidence of his cell phone and its stored data. We, however, need not address the merits of the defendant's various constitutional claims because we conclude that any error in the admission of the contents of the defendant's cell phone was harmless beyond a

[1] We granted the defendant's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly uphold the trial court's denial of the defendant's motion to suppress the contents of his iPhone in reliance on *United States* v. *Patane*, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004), and *State* v. *Mangual*, 311 Conn. 182, 85 A.3d 627 (2014), when the seizure of those contents was the result of questioning after he had invoked his *Miranda* rights, on the basis that a cell phone and its stored data constitute 'physical' (i.e., nontestimonial) evidence that need not be suppressed if seized as the result of a *Miranda* violation?" And (2) "[d]id the Appellate Court properly reject the defendant's claim that the holding in *Patane* does not comport with the broader protections against compelled self-incrimination afforded under article first, § 8, of the Connecticut constitution?" *State* v. *Sayles*, 336 Conn. 929, 247 A.3d 578 (2021).

The defendant initially did not seek certification to appeal from the portion of the Appellate Court's opinion rejecting his claims that (1) the seizure of his cell phone was not supported by the existence of probable cause and exigent circumstances, and (2) the affidavit supporting the application for a search warrant for his cell phone contained false information in violation of *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). See *State* v. *Sayles*, supra, 202 Conn. App. 755, 765. After we granted the defendant's petition for certification to appeal, we granted his subsequent motion for permission to file a supplemental brief raising those issues under the fourth amendment to the United States constitution.

State *v.* Sayles

reasonable doubt. Accordingly, we affirm the judgment of the Appellate Court.

The record reveals the following relevant facts and procedural history, much of which is aptly set forth in the opinion of the Appellate Court. "On April 6, 2015, Leighton Vanderberg drove around in his wife's Ford Focus with the defendant and Jamal Sumler. The three men proceeded to the Fair Haven section of New Haven and then toward Forbes Avenue. Sumler requested that they stop at a store. Vanderberg complied, drove to [the Pay Rite Food Store (Pay Rite)] convenience store and parked on the street. Vanderberg asked Sumler to purchase a couple of cigars and provided him with cash to complete the transaction. The defendant and Sumler went into the convenience store while Vanderberg remained in the vehicle.

"Sumler, wearing a grey hooded sweatshirt, entered the convenience store first. As he approached the counter, he pointed a pistol at the victim, Sanjay Patel, an employee at the convenience store. As Sumler moved behind a counter, the defendant entered the convenience store. The defendant pulled out a pistol from his pocket and, after a few moments, shot the victim. The defendant was handed a box of cigars and some cash. He then moved toward the entrance of the convenience store. As Sumler and the victim, who brandished a stool, engaged in a physical altercation, the defendant fled. After the defendant departed, Sumler shot the victim." (Footnote omitted.) *State* v. *Sayles*, supra, 202 Conn. App. 739–40. The victim later died from his injuries, namely, gunshot wounds to the torso and extremities. Id., 740 and n.4.

The three men fled in the Ford Focus to the Church Street South housing complex, where the defendant lived in an apartment. Id., 740. The defendant threw an entire box of cigars and the sweatshirt he was wearing

State *v.* Sayles

into a nearby dumpster. Id. "After receiving approximately $20 for gas from the defendant and thirty to forty cigars from Sumler, Vanderberg left the apartment." Id., 741.

"The next night, Vanderberg learned from a friend that the victim had been shot and killed at the [Pay Rite]. Thereafter, he informed his probation officer about what had transpired . . . . Following his arrest, Vanderberg met with police detectives on April 14, 2015, and identified the defendant and Sumler in photographs that were taken from surveillance video at the [Pay Rite]." Id., 741. On April 15, 2015, the police executed a search warrant for the defendant's residence. Id., 744. During their search, the police discovered a black ski mask and a dark colored pair of gloves. Id., 744 and n.10.

The defendant was not present at the time of the search, but, when he learned about the search later that day, he contacted the police and agreed to meet for an interview with Detectives Chistopher Perrone and David Zaweski at a New Haven police station. Id., 744. At the start of the video-recorded interview, Perrone read the defendant his *Miranda*[2] rights. Id., 744–45 and n.11. Perrone subsequently took the defendant's cell phone from the defendant's mother, who was holding it for him during the interview.[3] Id., 742, 744–45. The

---

[2] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Specifically, when the defendant first arrived at the police station, Perrone saw him holding his cell phone. *State* v. *Sayles*, supra, 202 Conn. App. 745. Although the detectives were not aware of this, before entering the interview room with them, the defendant had handed his cell phone to his mother, who was sitting on a nearby bench outside of that room. Id., 744. The defendant then asked to speak with an attorney. Id. Perrone briefly left the interview room, and, when he came back, he said to the defendant: "you have a cell phone . . . you had it out there. Who has your phone?" The defendant replied that his mother had the phone. Id., 742. Perrone again left the interview room, approached the defendant's mother, and asked if she had the defendant's cell phone. Id., 745. She responded affirmatively and handed it to Perrone. Id. Perrone then showed the cell phone to the defendant and asked if it was his, and the defendant confirmed that it was.

State *v.* Sayles

defendant and his mother then left the police station. The next day, the court granted Perrone's application for a search and seizure warrant to obtain data contained in the defendant's cell phone. Id., 742.

Ultimately, the police retrieved from the defendant's cell phone (1) an incoming text message telling the defendant not to come home at approximately the same time that the police were searching his residence, (2) a news report about the Pay Rite robbery, which had been downloaded after the search of the defendant's home, (3) communications between the defendant, Sumler, and Vanderberg on the night of the Pay Rite robbery, and (4) a draft, unsent text message, stating, "[i]f I get locked up tell sheema put them shits in the river some where worda loc."[4]

"After further investigation, the police arrested the defendant. In May, 2015, while in pretrial custody, he admitted to a fellow inmate [Derrick Hoover] that he and Sumler had shot the victim during the robbery of the [Pay Rite]." *State* v. *Sayles*, supra, 202 Conn. App. 741.

The state charged the defendant with felony murder in violation of § 53a-54c, conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c, and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). Prior to trial, the defendant moved to suppress evidence of his cell phone and its stored data. Following an evidentiary hearing, the trial court denied the defendant's motions to suppress,

Concerned about the potential loss of evidence through the erasure of data or loss of the device, Perrone took custody of the cell phone immediately, pending application for a search warrant. Id.

[4] Testimony at trial established that "sheema" referred to the defendant's girlfriend, Tysheema Barker.

State *v.* Sayles

first orally and later in a supplemental memorandum of decision. The case was then tried before a jury, which found the defendant guilty on all counts. The trial court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of eighty years of incarceration.

The defendant appealed from the judgment of conviction to the Appellate Court, claiming that ''(1) [the] police detectives [had] violated his *Miranda* rights and his rights pursuant to article first, § 8, of the Connecticut constitution when they continued to interrogate him after he invoked his right to counsel, (2) the police detectives [had] seized his cell phone in violation of the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution, and (3) the affidavit that the police [had] submitted in support of their application for a warrant to search the contents of his cell phone contained materially false information.'' (Footnote omitted.) *State* v. *Sayles*, supra, 202 Conn. App. 738–39. The Appellate Court rejected these claims, following this court's decision in *State* v. *Mangual*, 311 Conn. 182, 85 A.3d 627 (2014), and concluded that, under federal case law following the United States Supreme Court's decision in *United States* v. *Patane*, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004), a violation of *Miranda* constitutes a violation of only a prophylactic rule, and, thus, the fruits of the poisonous tree doctrine[5] did not require suppression of the contents of the defendant's cell phone. See *State* v. *Sayles*, supra, 739, 751–52; see also id., 748–50. As to the defendant's state constitutional claim seeking the adoption of a new prophylactic rule ''to protect against

_____

[5] Upon the determination that a constitutional violation has occurred, the fruit of the poisonous tree doctrine requires the exclusion ''not only [of] the illegally obtained evidence itself, but also . . . other incriminating evidence derived from the primary evidence.'' *Nix* v. *Williams*, 467 U.S. 431, 441, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984).

State *v.* Sayles

police tactics aimed at undermining the constitutional rights of a suspect,'' the court held that the defendant had abandoned the claim because his appellate brief contained only a single sentence of analysis. Id., 753; see id., 753–55. The Appellate Court rejected the defendant's fourth amendment claim, reasoning that the seizure of the cell phone was supported by probable cause and was justified under the exigent circumstances doctrine. See id., 761–65. Finally, the Appellate Court concluded that the record and the defendant's brief were inadequate for review of the defendant's claim under *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), that the affidavit that the police submitted in support of their application for a warrant to search the contents of his cell phone contained materially false information by omitting the fact that he had requested an attorney. See *State* v. *Sayles*, supra, 767–79. Accordingly, the Appellate Court affirmed the judgment of conviction. Id., 769. This certified appeal followed. See footnote 1 of this opinion.

On appeal, the defendant claims that the Appellate Court improperly upheld the trial court's denial of his motions to suppress evidence of his cell phone and the data stored therein for several reasons. Principally, however, the defendant provides a comprehensive analysis under *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992), and claims that article first, § 8, of the Connecticut constitution mandates protection of a suspect's *Miranda* rights via the adoption of a rule ''that evidence obtained through questioning a suspect after the suspect has invoked the right to counsel [pursuant to *Edwards* v. *Arizona*, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981)] must be suppressed and cannot be used in the state's case-in-chief [at] a subsequent trial.''[6]

_____

[6] In addition to his state constitutional claim, which presents an issue of first impression, the defendant also contends that the Appellate Court improperly relied on the United States Supreme Court's decision in *United*

348 Conn. 669 MARCH, 2024 679

State *v.* Sayles

In response, the state contends that it is unnecessary to reach the constitutional issues raised by the defendant because any error in the admission of the cell phone and its stored data was harmless beyond a reasonable doubt, insofar as the "evidence of the contents of the [cell] phone was relatively minor and had no tendency to influence the judgment of the jury in view of the totality of the evidence . . . ."[7] The state's arguments are consistent with "the doctrine of constitutional avoidance," which this court often applies "not to decide difficult questions of constitutional law when the state has established that any constitutional error will not affect the result of the appeal because it is harmless beyond a reasonable doubt." *State* v. *Dickson*, 322 Conn. 410, 497, 141 A.3d 810 (2016) (*Robinson, J.*, concurring), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017); see, e.g., *State* v. *Bowden*, 344 Conn. 266, 276, 278 A.3d 472 (2022) (declining to

_____

*States* v. *Patane*, supra, 542 U.S. 630, in concluding that the fruit of the poisonous tree doctrine did not require suppression of the contents of the defendant's cell phone under the fifth amendment to the United States constitution. Specifically, he argues that this case did not involve a simple failure to give the *Miranda* warnings because, by continuing the interrogation, the detectives "deliberate[ly] flout[ed]" the defendant's invocation of his right to counsel under *Edwards* v. *Arizona*, supra, 451 U.S. 477. He also argues that evidence of the contents of a cell phone is not physical evidence but, instead, is testimonial evidence. As a corollary, the defendant contends that (1) the trial court made clearly erroneous factual findings concerning whether the defendant was free to leave the police station and whether the interview had ended when the police asked the defendant for his cell phone, and (2) the police interview was custodial in nature and triggered his protections under *Miranda*. Finally, the defendant argues that, under *Riley* v. *California*, 573 U.S. 373, 134 S. Ct. 2473, 189 L. Ed. 2d 430 (2014), and *State* v. *Smith*, 344 Conn. 229, 278 A.3d 481 (2022), the "all data" search warrant used to obtain the cell phone violated the fourth amendment to the United States constitution because it was not supported by probable cause and because it lacked sufficient particularity.

[7] As an additional, alternative ground to uphold the denial of the motion to suppress, the state also relies on the inevitable discovery and independent source doctrines to bar the application of the exclusionary rule in this case. Given our conclusion as to the state's harmless error claim, we need not address this alternative ground.

State *v.* Sayles

consider "[the] important issue" of whether seizure of defendant's cell phone was supported by sufficiently particular warrant because any error was harmless beyond reasonable doubt); *State* v. *Tony M.*, 332 Conn. 810, 821–22, 213 A.3d 1128 (2019) (declining to consider whether trial court properly found that defendant voluntarily waived his *Miranda* rights because any *Miranda* violation from admission of his statement would be harmless beyond reasonable doubt); *State* v. *Jordan*, 314 Conn. 89, 96–97, 100–101, 101 A.3d 179 (2014) (declining to decide whether closet was within defendant's control for purposes of search incident to arrest doctrine because any fourth amendment violation in admitting drugs found in closet was harmless beyond reasonable doubt).

Accordingly, before addressing the defendant's various constitutional claims, we turn to the state's harmless error arguments. The state contends that the importance of the cell phone data paled in comparison to Vanderberg's testimony, which was corroborated by independently obtained cell site location data—the legality of which is unchallenged[8]—establishing that

[8] The defendant does not challenge the legality of the cell site location data associated with his cell phone that was obtained via a search warrant issued to his cellular service provider. Nevertheless, the dissent argues that the cell site location data evidence is itself fruit of the poisonous tree that should have been excluded from evidence and, therefore, not considered in the harmless error analysis. See footnote 4 of the dissenting opinion. This analysis marks a departure from the adversarial process, pursuant to which claims are framed and raised by parties and then reviewed by the courts; see, e.g., *State* v. *Stephenson*, 337 Conn. 643, 653, 255 A.3d 865 (2020); insofar as the dissent raises a claim that the defendant himself has abandoned by not briefing. See, e.g., *Traylor* v. *State*, 332 Conn. 789, 805, 213 A.3d 467 (2019) ("[a]n unmentioned claim is, by definition, inadequately briefed, and one that is generally . . . considered abandoned" (internal quotation marks omitted)); *State* v. *O'Brien-Veader*, 318 Conn. 514, 562, 122 A.3d 555 (2015) (inadequately briefed claims are abandoned). Absent resort to the supplemental briefing procedure provided by *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 161–62, 84 A.3d 840 (2014), for courts raising such claims sua sponte, we deem the legality of the cell site location data undisputed and afford it full consideration in conducting our harmless error analysis.

State *v.* Sayles

the defendant's phone was in the vicinity of Howard Avenue, Pay Rite, and Church Street South, where the defendant's mother lived, before, during, and after the robbery. The state emphasizes that additional corroboration of Vanderberg's account is provided by Hoover's testimony that the defendant had told him that his phone had " '[taken] a hit where the crime was,' '' which he intended to address "by having his cousin take responsibility for the phone while it was in the vicinity of Pay Rite.'' The state argues further that Hoover's jailhouse informant testimony was "independently corroborated'' with respect to "almost every important detail'' and that Vanderberg's testimony was similarly corroborated by the video surveillance footage establishing "the approximate sizes of the robbers, the different lettering on their sweatshirts, the fact that they were both masked and gloved, and that they stole cigars in bluish wrappers.'' Finally, the state observes that "DNA consistent with that of the defendant and Sumler was found on the masks seized from their residences.''

Focusing in particular on the unsent text message telling Baker to "put them shits in the river,'' which the state suggested referred to murder weapons, the defendant contends in response that the state cannot establish that any error was harmless beyond a reasonable doubt. The defendant argues that this evidence covered up numerous gaps in the state's case, which "rested on inferences from imprecise cell site location data and the testimony of dubious value from shady felons,'' and which suffered from "no eyewitnesses to the shooting, no evidence (aside from Vanderberg's self-serving testimony) placing the defendant definitively at the scene, no fingerprints or DNA linking the defendant to the shooting, no murder weapon, and no evidence after a search of his house or clothes that linked him to the shooting.'' In particular, the defendant observes that the prosecutor referred to the unsent text message

State *v.* Sayles

four times during closing argument, which "demonstrates its importance" to the state's case. The defendant also argues that the "fact that a mask found in [his] home had his DNA on it . . . is meaningless. He owned it. There was no connection made between the mask and the shooting of the clerk." (Citation omitted.) Finally, the defendant argues that he had been "eliminated as a contributor to the DNA found on and in Vanderberg's car and the mask found in it," and that the police failed (1) "[to test] the gloves taken from the defendant's home for gunshot residue," (2) to "pull any footage from video cameras near the defendant's apartment to check Vanderberg's testimony about the dumpster," and (3) to locate "Vanderberg's sweatshirt" or analyze his DNA. We agree with the state, however, and conclude that the consistency and independent corroboration of the testimony of Vanderberg, Hoover, and a statement from Jeremiah Samuels, a friend of the defendant, render any error with respect to the admission of the unsent text message harmless beyond a reasonable doubt.

It is well established that "the test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]. . . . Additional factors that we have considered in determining whether an error is harmless in a particular case include the importance of the challenged evidence to the prosecution's case, whether it is cumulative, the extent of cross-examination permitted, and the presence or absence of corroborating or contradicting evidence or testimony." (Internal quotation marks omitted.)

State *v.* Sayles

*State* v. *Johnson*, 345 Conn. 174, 196, 283 A.3d 477 (2022). "In other words, we [must be] satisfied beyond a reasonable doubt that the result would be the same without the admission of the assumedly improper evidence." *State* v. *Jordan*, supra, 314 Conn. 104; see, e.g., *State* v. *Russaw*, 213 Conn. App. 311, 358, 278 A.3d 1, cert. denied, 345 Conn. 902, 282 A.3d 466 (2022). This inquiry is an objective one and requires us to consider the quality and quantity of both the inadmissible evidence and the admissible evidence that remains to support the verdict of the jury. See, e.g., *State* v. *Van Kirk*, 306 Mont. 215, 227–28, 32 P.3d 735 (2001); *State* v. *Boudreau*, 175 N.H. 806, 817, 305 A.3d 905 (2023); see also *State* v. *Bowden*, supra, 344 Conn. 276–77 ("we begin our analysis of harmlessness by placing the pieces of inadmissible evidence obtained from the defendant's cell phone in the context of the other evidence properly admitted at trial").

Our review of the trial record demonstrates that the state offered an overwhelming wealth of evidence beyond the unsent text message to prove that the defendant had committed felony murder and conspiracy to commit robbery in the first degree. To begin, surveillance camera footage from inside the Pay Rite on Forbes Avenue shows that a person entered the store holding a handgun in his right hand and wearing a gray hoodie with writing down the sleeves, a dark ski mask, and dark gloves. This person approached the counter and pointed a gun at the clerk. A second person then entered the store wearing a dark colored hoodie with light colored writing across the front, a dark ski mask, and dark gloves. The first person went behind the counter as the second person stood in front of it. The second person removed a handgun from his hoodie and fired it at the clerk, who is seen clutching his midsection. The first person handed what appears to be a handful of currency to the second person as the wounded clerk handed the

State *v.* Sayles

second person what appears to be a cigar box. As the second person began to exit the store, the clerk swung a stool at the first person, who also shot the clerk before exiting the store.

Testifying for the state, Vanderberg, who drove the car used in the commission of the Pay Rite robbery, identified the two shooters in the surveillance video as the defendant and Sumler, and he described them both as being approximately five feet, seven inches tall. As to the events leading up to the robbery and shooting, Vanderberg testified that, on the day of the crime, he had been driving around New Haven in his wife's green Ford Focus when he received a call or FaceTime from either the defendant or Sumler, and they planned to meet and hang out. About fifteen minutes after the call, Vanderberg picked up the defendant and Sumler in his wife's vehicle on Dixwell Avenue in New Haven, and they drove around smoking marijuana. Vanderberg testified that he, the defendant, and Sumler never discussed committing a robbery. According to Vanderberg, at Sumler's request, he parked at "Eddy's" convenience store on Howard Avenue, where Sumler placed a gun in a cupholder and then exited the vehicle. The defendant took the gun from the cupholder. After a few minutes, Sumler returned to the vehicle with two pairs of black gloves, put on one pair, and gave the defendant the other. The defendant returned the gun to Sumler and asked Vanderberg for a sweatshirt. Vanderberg gave him a blue Nautica hoodie.

The three men then continued to drive around New Haven before stopping at the Pay Rite on Forbes Avenue. Vanderberg parked around the corner and asked the defendant and Sumler to get him some cigars. The defendant and Sumler exited the vehicle; both were wearing hoodies, and Sumler was holding his gun. A few minutes later, the defendant came back to the vehicle, walking fast while holding something in his hoodie and

State *v.* Sayles

dropping cigars from his hands. Sumler then walked calmly back to the vehicle. Vanderberg drove the defendant and Sumler to the defendant's apartment complex, where the defendant threw a cigar box and Vanderberg's hoodie in a dumpster. Once inside the defendant's apartment, Sumler handed the defendant his gun, which the defendant placed in a storage area outside of his apartment. While talking at the apartment, the defendant told Vanderberg that his and Sumler's actions at Pay Rite were "some spur of the moment shit," from which Vanderberg inferred that they had robbed the convenience store. At that point, however, he did not know about the shooting. Vanderberg testified that, the day after the shooting, he learned that the clerk had been killed, and what happened "just wasn't sitting right with" him. Accordingly, he decided to inform his probation officer of what had happened and to arrange a meeting with law enforcement officers. He testified at trial pursuant to a plea agreement with the state.[9]

Vanderberg's detailed testimony was far from the only evidence linking the defendant to the crime.[10] Hoo-

[9] Vanderberg acknowledged further that he had a history of criminal activity, including charges of felony murder in connection with the robbery of a Bridgeport convenience store a few days after the events at issue in the present case. He also admitted that he had unspecified pending charges and had entered into a plea agreement with the state, pursuant to which he agreed to testify, although the state did not promise to recommend a specific sentence unless required to do so by the court.

[10] The dissent disagrees with our view that, for purposes of assessing harmless error, the value of the testimony of Vanderberg and Hoover, and the prior inconsistent statement of Samuels, is enhanced by the fact that this evidence independently corroborates each other. The dissent contends that it is "most likely" that the evidence from the defendant's cell phone persuaded the jury to believe their otherwise "inherently dubious" testimony. Part III of the dissenting opinion. The dissent then illustrates the suspect nature of testimony from accomplices or jailhouse informants by citing certain sister state cases for the proposition that some states will not even permit the testimony of accomplices or jailhouse informants to come into evidence without corroboration by a source other than another accomplice or jailhouse informant. See part III and footnote 7 of the dissenting opinion; see also, e.g., *State* v. *Harris*, 405 N.W.2d 224, 227 (Minn. 1987); *People* v.

State *v.* Sayles

ver, a jailhouse informant, testified that, for four or five

*Ohlstein*, 54 App. Div. 2d 109, 112, 387 N.Y.S.2d 860 (1976), aff'd, 44 N.Y.2d 896, 379 N.E.2d 222, 407 N.Y.S.2d 696 (1978); *Chapman* v. *State*, 470 S.W.2d 656, 660 (Tex. Crim. App. 1971); cf. *Schnidt* v. *State*, 357 S.W.3d 845, 851 (Tex. App. 2012) (standard for corroboration of accomplice and jailhouse informant testimony is same, and one cannot corroborate the testimony of the other), review denied, Texas Court of Criminal Appeals, Docket No. PD-0311-12 (April 18, 2012). The dissent "fail[s] to understand" how such witnesses' "powerful incentive . . . to implicate the defendant falsely in the crimes charged . . . is eliminated or even reduced by the fact that multiple witnesses all share the same motivation." Part III of the dissenting opinion.

We respectfully disagree with the dissent's reliance on this body of case law. First, as the dissent acknowledges, the accomplice corroboration rule is one of evidentiary sufficiency that is not required at common law and that has largely been implemented by statute in approximately one-half of the states, "requiring, in varying degrees, that the testimony of an alleged accomplice be corroborated by independent evidence, that is, evidence not dependent on an accomplice." *State* v. *Jones*, 466 Md. 142, 158, 216 A.3d 907 (2019). In overruling its common-law accomplice corroboration rule as arbitrary and an intrusion on the jury's constitutional role as fact finder; see id., 160–62; Maryland's highest court recently observed that "most jurisdictions (thirty-two states, the District of Columbia, the federal courts, Puerto Rico, Guam, and the Virgin Islands) either have not adopted the accomplice corroboration rule or have since repealed it," leaving Tennessee as "the only [jurisdiction] with a [judicially created] accomplice corroboration rule." Id., 160–61. Most significant, Connecticut does not have a common-law or statutory rule requiring the corroboration of accomplice or jailhouse informant testimony as a matter of law, with recent legislation addressing jailhouse informant testimony concerning disclosure; see General Statutes § 54-86*o*; and, in certain serious felony cases, more wholistic assessments of reliability beyond corroboration under General Statutes § 54-86p. See, e.g., *State* v. *Jones*, 337 Conn. 486, 505–506, 254 A.3d 239 (2020). Instead, in our view, the informant and accomplice testimony in this case is consistent with those indicators of reliability, including "(1) [t]he extent to which the jailhouse witness's testimony is confirmed by other evidence; (2) [t]he specificity of the testimony; (3) [t]he extent to which the testimony contains details known only by the perpetrator of the alleged offense; (4) [t]he extent to which the details of the testimony could be obtained from a source other than the defendant; and (5) [t]he circumstances under which the jailhouse witness initially provided information supporting such testimony to [the police] . . . or a prosecutorial official, including whether the jailhouse witness was responding to a leading question." General Statutes 54-86p (a); see, e.g., *State* v. *Jones*, supra, 506.

Second, even in states that have accomplice corroboration rules, it is by no means settled law that the testimony of a jailhouse informant cannot be

State *v.* Sayles

months, he was held in the same correctional facility as the defendant after the defendant's arrest for the Pay Rite robbery. According to Hoover, he and the defendant spoke almost every day during that time, and the defendant talked to him about the Pay Rite robbery three or four times per week. Specifically, the defendant told Hoover that he and another man had shot the clerk at the Pay Rite on Forbes Avenue. The defendant also told Hoover that he wanted to get his cell phone "thrown out" of evidence because it contained a photograph of the gun used in the robbery, that the police had discovered his ski mask and gloves at his residence, that he was worried that the ski mask and gloves might have his DNA on them, that he planned to testify that he had used the mask for dirt biking, that Vanderberg had remained in the vehicle during the robbery, that they shot the clerk because he "took too long," that both he and Sumler shot the clerk, that they both had guns, that they stole money and cigars, that, after the shooting, he hid the gun at his girlfriend's house but moved it after the police searched his residence, that his cell phone "took a hit" where the crime occurred, that he planned to testify that his cousin had his cell phone in that area, that, if he could get a low enough bond, he would run "down south," and that he wanted someone to call Vanderberg's wife to tell her that Vanderberg

_____

used to corroborate that of an accomplice. Compare *People* v. *Huggins*, 235 Cal. App. 4th 715, 718–19, 185 Cal. Rptr. 3d 672 (2015) (concluding that statutes requiring corroboration of accomplice and jailhouse informant testimony do not preclude use of jailhouse informant testimony to corroborate accomplice testimony, and rejecting request "to impose a judicially created rule that accomplices and in-custody informants cannot corroborate each other's testimony because both are self-interested"), review denied, California Supreme Court, Docket No. S226350 (July 8, 2015), and *State* v. *Pippitt*, 645 N.W.2d 87, 94 (Minn. 2002) (rejecting argument that jailhouse informant was not credible as matter of law for purposes of corroborating accomplice testimony), with *Johnson* v. *State*, Docket No. 11-14-00311-CR, 2017 WL 3923665, *6–7 (Tex. App. August 31, 2017) (discussing split of authority on this point among intermediate appellate courts in Texas).

State *v.* Sayles

needed to recant. Hoover testified that he documented these conversations on a notepad in his cell so he could "help [his] situation."

Additional corroboration was provided by a statement by Samuels, which was admitted into evidence for substantive purposes under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[11] Samuels had been arrested for another crime when, during an interview with the police, he provided information about the Pay Rite robbery, some of which was not publicly available. Specifically, Samuels told the police that he had spoken to Sumler and the defendant on the day of the Pay Rite robbery, and they told him that Sumler had a .357 caliber firearm, that Sumler and the defendant had both worn masks and had both shot the clerk, and that the proceeds of the robbery amounted to Dutch Masters brand cigars and some money. Samuels also told the police that he previously had known Sumler and the defendant to possess or have access to a semiautomatic handgun that he referred to as either a "deuce deuce" (.22 caliber) or a "deuce five" (.25 caliber). Samuels also informed the police that, after Vanderberg's arrest, the defendant told Samuels that Vanderberg could not inculpate him because Vanderberg had not been inside the store with him and Sumler during the robbery.

The state also offered evidence that, after Samuels spoke with the police, but before his incarceration on other charges, the defendant had his cousin, James

---

[11] "In *Whelan*, [this court] adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination. This rule has also been codified [at] § 8-5 (1) of the Connecticut Code of Evidence, which incorporates all of the developments and clarifications of the *Whelan* rule that have occurred since *Whelan* was decided." (Internal quotation marks omitted.) *State* v. *Gray*, 342 Conn. 657, 686, 271 A.3d 101 (2022).

State *v.* Sayles

"Sucky" Douglas, assault Samuels to force him to recant his testimony. Specifically, Hoover testified that the defendant told him that he had Sucky beat up an individual identified as either "JS or JC" to get him to recant his statement to the police. Consistent with Hoover's testimony, Samuels testified that he had a physical altercation with someone named Sucky after he spoke to the police. The state offered into evidence a statement Samuels wrote after this physical altercation, in which he stated that he had provided the police with false information and that he wanted to recant. Samuels also wrote a letter to Sumler, stating that he could "make it right" by giving a statement that he had been "high" at the time of the interview and that he had provided the police with "bullshit." Indeed, at trial, Samuels testified that he had been under the influence of Xanax during the police interview, had lied to the police about the Pay Rite case, and wished to recant. This testimony set the foundation for the admission of a redacted version of his interview with the police under *Whelan*.

The record also contained physical evidence corroborating the testimony and statements of Vanderberg, Hoover and Samuels.[12] The state entered into evidence

[12] Thus, we respectfully disagree with the dissent's blanket statement that "[t]here was *no physical evidence* connecting the defendant to the crimes." (Emphasis added.) Part III of the dissenting opinion. The dissent, however, concedes that the police recovered a ski mask and gloves—plainly items of physical evidence—from the defendant's home but seeks to diminish the importance of this evidence because, in the dissent's view, ski masks and gloves are commonly found items in many homes located in the northeastern United States. See id. The presence of the mask and gloves is nevertheless of greater significance in light of the other evidence showing that the robbers wore ski masks and that the defendant's cell phone was in the vicinity of the Pay Rite at the time of the shooting. Moreover, the defendant's statement to Hoover about his concern that the police might find his DNA on the mask and gloves would be an odd thing say if he was not concerned that the police would be able to link the mask and gloves to those worn by the perpetrators. Finally, the jury was free to compare the mask and gloves recovered from the defendant's closet to the mask and gloves worn by the perpetrators in the surveillance video for similarities that would render them more probative evidence.

State *v.* Sayles

a black ski mask and a pair of black gloves, which the police had seized when they searched the defendant's home in the Church Street South housing complex. Additionally, Daniel Renstrom, a forensic science examiner with the state forensic science laboratory, testified that an analysis of the DNA discovered on the ski mask found inside the defendant's apartment indicated that the defendant was a potential contributor to that DNA, with the expected frequency of Black and white people as contributors to that sample being one in five. The defendant is a Black male.[13]

James J. Wines, a special agent for the Federal Bureau of Investigation, testified regarding the historical cell site location data associated with the defendant's cell phone. This data established that the cell phone was in the areas of Howard Avenue, the Pay Rite convenience store on Forbes Avenue where the victim was killed, and Church Street South at about the same times that Vanderberg testified that he, the defendant, and Sumler were at those locations. In particular, prior to the shooting, at both 7:11 and 7:15 p.m., the defendant's cell phone pinged the same cell tower, which covered the area of Howard Avenue. At 7:16 p.m., the defendant's phone pinged a different cell tower that covered an area that included the Pay Rite on Forbes Avenue. Wines testified that both cell towers pinged during this timeframe were in clear signal areas, meaning that the likelihood of the cell signal being redirected to another tower was minimal. Following the shooting, between 8:29 and 11:30 p.m., the defendant's cell phone pinged a third cell tower near his apartment eleven times. Wines conceded that he could not provide the exact location of the

---

[13] Additionally, upon a search of Sumler's residence pursuant to a warrant, the police discovered grey sweatpants, black gloves, a black mask, nine millimeter bullets, and .38 caliber bullets. Jill Therriault, a firearms examiner, testified that three .38 caliber bullets and one .25 caliber bullet were recovered from the crime scene. All three .38 caliber bullets were fired from the same gun.

State *v.* Sayles

defendant's cell phone at any specific time. He also acknowledged that a cell phone signal could move from one tower to another without the cell phone and user moving.

In addition to physical evidence, the state also offered the testimony of Jonathan Gavilanes. He testified that, at the time of the shooting, he was across the street from the Pay Rite at an auto repair shop. He heard the sound of a gunshot, looked out the shop window, and saw a man wearing a ski mask run out of the convenience store. He then heard a second gunshot and saw another man wearing a ski mask run out of the convenience store. Gavilanes testified that both men were wearing sweatshirts, and both were "[a]bout five feet, seven inches [tall], almost [Gavilanes'] height," which was six feet tall.

Having reviewed the record in this case, we are convinced that any impropriety in the admission of the cell phone and its stored data was harmless beyond a reasonable doubt. The defendant correctly observes that the testimony of Vanderberg and Hoover is properly viewed with some skepticism, given their obvious self-interest in testifying for the state as an accomplice and a jailhouse informant, respectively. See, e.g., *State* v. *Jones*, 337 Conn. 486, 501–503, 254 A.3d 239 (2020); *Birch* v. *Commissioner of Correction*, 334 Conn. 37, 65–66, 219 A.3d 353 (2019); *State* v. *Patterson*, 276 Conn. 452, 468–70, 886 A.2d 777 (2005). Nevertheless, what may be qualitatively weak evidence—especially standing alone—may grow in strength considerably when viewed in context. See, e.g., *State* v. *Maner*, 147 Conn. App. 761, 778, 780–81, 83 A.3d 1182 (in determining that claimed confrontation clause violation was harmless beyond reasonable doubt, court considered defendant's confession to jailhouse informant in combination with eyewitness testimony), cert. denied, 311 Conn. 935, 88 A.3d 550 (2014). The record demonstrates that the qual-

State *v.* Sayles

ity of the testimony of Hoover and Vanderberg grows by leaps and bounds with the degree of independent corroboration present in this case.

First, Vanderberg's testimony was corroborated by the video of the police interview, admitted under *Whelan*, in which Samuels stated that the defendant had also admitted to him his involvement in the robbery and shooting of the store clerk at the Pay Rite. Evidence that the defendant had his cousin use physical force to intimidate Samuels into recanting provides significant evidence of consciousness of guilt and also bolstered Samuels' previous statement to the police that the defendant had admitted his role in the robbery and the shooting to him. See *State* v. *Bowden*, supra, 344 Conn. 279–80 (impact of improper cell phone and text message evidence was heavily undercut by consciousness of guilt evidence, namely, witness tampering and destruction of evidence).

Second, Vanderberg's testimony was independently corroborated by Hoover's testimony that the defendant admitted that (1) he had robbed the Pay Rite and shot the clerk, (2) his cell phone "took a hit" in the area of the crime, (3) he planned to testify that his cousin had his cell phone at the time of the crime, and (4) he was worried about his DNA being on the ski mask and gloves that the police had discovered at his residence. In addition to this level of detail, what makes the quality of Hoover's jailhouse informant testimony particularly compelling is that it contains information—not available to the public—that would not have been known to anyone except the perpetrators. See *State* v. *Jones*, supra, 337 Conn. 510 (in assessing credibility of informant, fact finder may consider, inter alia, "[t]he extent to which his testimony is confirmed by other evidence . . . [t]he specificity of the testimony . . . [and] [t]he extent to which the testimony contains details known only by the perpetrator" (internal quotation marks omit-

State *v.* Sayles

ted)). That Hoover, who had no prior connection to the defendant or the crimes at issue, knew details about the crime that were not available to the public significantly bolstered his credibility and the qualitative strength of his testimony.

Finally, the most powerful evidence corroborating the testimony of Hoover and Vanderberg is cell site location data, the legality of which is unchallenged; see footnote 8 of this opinion; establishing that the defendant's phone was (1) in the area of Howard Avenue when he was picked up by Vanderberg, (2) in the area of the Pay Rite on Forbes Avenue at the approximate time of the robbery and shooting, and (3) in the area of Church Street South, where the defendant lived with his mother, just after the crime. Nevertheless, the defendant contends that the cell site location data are of minimal weight because "[t]he fact that [his] cell phone was in the vicinity of his . . . apartment, as well as Howard Avenue and the general area where the shooting occurred at around the same time as the shooting . . . is not dispositive; he lived there." (Citation omitted.) This argument oversimplifies the meaning of the evidence. As Wines explained, the cell site location data did not merely show that the defendant was in the vicinity of these three areas at the same time; it did not show that, at 7:16 p.m., the defendant's phone pinged a cell tower that covered all of Howard Avenue, the area of the shooting *and* his apartment. Rather, this evidence showed that the defendant was closest to the tower in the area of the shooting, and *not* the tower in the area of the apartment where he lived, at 7:16 p.m. Indeed, Wines testified that the cell towers in the area of the defendant's apartment and in the area of the shooting each had clear visibility, limiting the potential for the cell phone to have pinged cell towers further away from the cell phone's actual location. Although Wines conceded that the cell site location data could

State *v.* Sayles

not precisely pinpoint the defendant's location, this imprecision nevertheless was limited by the fact that the clear visibility at each cell tower meant that it was far more likely that the defendant's location was within the area of the pinged cell tower.

Beyond the cell site location data, still more evidence independently corroborated nearly every important detail of Vanderberg and Hoover's testimony, including the in-store surveillance footage, consistent with Gavilanes' eyewitness testimony, showing the suspects' height, and the presence of black gloves and a ski mask in the defendant's residence. See, e.g., *State* v. *Smith*, 344 Conn. 229, 262–63, 278 A.3d 481 (2022) (in determining harm, testimony of witness was bolstered by video footage). Nevertheless, the defendant argues that Gavilanes' eyewitness testimony did not bolster the testimony of Hoover or Vandenberg because Gavilanes testified that the two shooters were "almost [his] height," which was six feet tall, whereas the defendant was five feet, seven inches tall. This argument mischaracterizes Gavilanes' testimony. He testified that both suspects were "[a]bout five feet, seven inches [tall], *almost* [Gavilanes'] height," which was six feet tall, so Gavilanes testified that the suspects were "shorter" than him. (Emphasis added.) Similarly, the defendant argues that the in-store surveillance footage and Vanderberg's testimony conflicted because the footage did not show Vanderberg giving the defendant a sweatshirt from his truck *right before* the robbery, and, thus, neither corroborated the testimony of Hoover and Samuels. This argument again misunderstands the testimony. Vanderberg testified that he had given the defendant a sweatshirt from his trunk before the robbery but that he was not sure precisely when and where he did so. Specifically, he thought this occurred while the three men were "at Eddy's or somewhere in the Hill [section of New Haven]."

State *v.* Sayles

We also disagree with the defendant's argument that the lack of linchpin DNA evidence significantly undermines the state's harmless error claim in this case. The evidence showed that the defendant was one of the 20 percent of Black or white Americans who could have contributed DNA to the ski mask, the ski mask was discovered where the defendant lived, and the mask was similar in appearance to the ski mask worn by the suspects shown in the surveillance footage. Although the DNA evidence standing alone is far from definitive, considered in the context of the other properly admitted evidence, it nevertheless supports a nexus between the defendant and the shooting.

Finally, in assessing the potential impact of improperly admitted evidence on the jury's verdict, we consider the parties' closing arguments in order to assess its centrality to the factual issues in the case, with the degree of the parties' emphasis and reliance on the improperly admitted evidence indicative of its importance to the jury's verdict. See, e.g., *State* v. *Culbreath*, 340 Conn. 167, 195, 263 A.3d 350 (2021). We acknowledge that the prosecutor mentioned the draft text message retrieved from the defendant's cell phone— evidence that the defendant principally claims to have harmed him[14]—several times during closing and rebut-

---

[14] As we noted previously; see text accompanying footnote 4 of this opinion; and as the dissent emphasizes in great detail; see part II of the dissenting opinion; the police retrieved other potentially incriminating evidence from the defendant's cell phone, as well, including a text message purportedly from his mother not to come home during the execution of the search warrant and Internet searches for news stories about the Pay Rite robbery. Nevertheless, the defendant's harmless error arguments are focused exclusively on the impact of the unsent text message. Although we focus on the case as argued by the defendant, which relies nearly entirely on the unsent text message element, we emphasize that the inclusion of the other items found in the data on the defendant's cell phone does not change our conclusion that the strength of the state's case renders the assumed constitutional violation harmless beyond a reasonable doubt. See, e.g., *State* v. *Stephenson*, 337 Conn. 643, 653, 255 A.3d 865 (2020) (describing how parties customarily raise and argue claims in adversarial system).

State *v.* Sayles

tal arguments. Viewed in context, however, the prosecutor's focus on the unsent text message was minimal relative to the other evidence admitted at trial. Not only did the prosecutor address the testimony of Vanderberg and Hoover, the statement of Samuels, and Wines' testimony about the cell site location data before mentioning the contents of the cell phone, but the prosecutor emphasized that other evidence far more strongly.[15] After defense counsel's closing argument, in which counsel asserted the theory that Vanderberg had framed the defendant to mitigate his own culpability as the getaway driver for both the Pay Rite robbery and another fatal convenience store shooting in Bridgeport,[16] the prosecutor gave a rebuttal argument. In the

---

[15] Specifically, during her initial closing argument, the prosecutor reviewed the evidence that the state had presented. The prosecutor spent the first quarter of her closing argument focused on Vanderberg's testimony. Then, the prosecutor reviewed the testimony of Gavilanes, the police officers who responded to the crime scene, and the associate medical examiner who examined the victim's body. The prosecutor emphasized the contents of the video recording of Samuels' original statement to the police and then reviewed Hoover's testimony. Only then did the prosecutor mention the cell phone's contents and, even then, referred specifically to the unsent, draft text message only briefly. Instead, the prosecutor proceeded to emphasize Wines' testimony and the cell site location data.

Specifically, with respect to the contents of the defendant's cell phone, the prosecutor argued: "In the series of text messages that [was] presented, there's a text message that was received by the defendant's [cell] phone at 3:55 a.m. on April 15, 2015, that says, '[d]o not come here.' There was also testimony that, later that day, the same day, April 15, 2015, the defendant and his mother went to the New Haven Police Department to talk to detectives about why they were at . . . his house. In the same string of text messages, there's a text message that . . . was not sent, although [there was testimony establishing that] there were numerous reasons why a text message may not be sent. Maybe [the cell phone] lost contact with the server, but there's a text message that was typed on the defendant's phone, '[i]f I get locked up tell sheema put them shits in the river some where [worda loc].' "

[16] During his closing argument, defense counsel asserted that it was Vanderberg and not the defendant who had robbed the Pay Rite and shot the clerk. Defense counsel's closing argument contained an exhaustive attack on Vanderberg's credibility, focusing on the fact that he was involved in another robbery and shooting in Bridgeport soon after the Pay Rite robbery

State *v.* Sayles

rebuttal argument, the prosecutor addressed the various attacks on Vanderberg's credibility. The prosecutor again emphasized the importance of the cell site location data and urged the jury to credit the testimony of Hoover and the video of Samuels' police interview, both of which independently referred to statements by the defendant admitting his participation in the Pay Rite robbery and shooting. Only after discussing in detail the other physical evidence of the crime—the bullet fragments and the gloves and ski mask found in the defendant's residence—did the prosecutor again raise the topic of the unsent draft text message, arguing that it referred to throwing the gun used in the robbery into the river.[17] Thus, the contents of the defendant's cell phone played only a minor role in the prosecutor's closing and rebuttal arguments relative to the other evidence that more directly linked the defendant to

and that both crimes shared many similarities, like two suspects wearing ski masks, robbing a convenience store, and shooting the clerk. Thus, counsel argued that the defendant was not involved in the Pay Rite robbery at all and that Vanderberg falsely accused the defendant in an attempt to create a credible defense that Vanderberg did not know that he had used his wife's car to act as a getaway driver for deadly convenience store robberies in Bridgeport and New Haven.

[17] The prosecutor specifically argued in rebuttal: "And what were those texts? When he got the first one right around the time the police are actually tossing his house, from someone to [the defendant], '[d]o not come here.' Later that day, a text that we know was never sent, but it was drafted on that phone, '[i]f I get locked up tell sheema put them shits in the river some where [worda loc].' Shits can mean anything, right? People are constantly throwing stuff in the river. Does that make sense, or does it make more sense that he keeps his gun at his girlfriend's house? He knows he's going to get locked up for this offense, and he's desperately trying to get the word out to get rid of those guns. . . . How about the conversation with Sheema? They're talking about the text message. She had met with [the inspector from the state's attorney's office] a couple [of] days earlier. Of course, she hasn't seen [the defendant] in over [one] year, but she decides to go and pay him a visit days before she gets on the stand. And he says, '[t]hat don't mean nothing. You never got it. That don't mean nothing.' He's not worried at all. What's he referring to? Is he referring to the guns? Is he referring to the text message? I don't know. It certainly shows knowledge of something though, doesn't it?"

State *v.* Sayles

the charged crimes. Additionally, the contents of the defendant's cell phone played no role in establishing an element of the offense, or bolstering or destroying the credibility of any particular witness, which lessens the impact of any improper admission into evidence.

Indeed, our case law establishes that a prosecutor's reliance on illegally obtained evidence in closing arguments—even evidence more directly incriminating than the text message at issue in this case—is not dispositive. See *State* v. *Tony M.*, supra, 332 Conn. 819, 823–25 and n.8 (any *Miranda* violation resulting from defendant's statement that tossing his infant son off bridge was akin to basketball " 'free throw' " was harmless beyond reasonable doubt as to element of intent, even though it was used to impeach his testimony at trial that drop was accidental, given "[the] overwhelming, independent evidence of the defendant's intent to kill his baby that the jury could have credited," including text messages sent to baby's mother on night of murder, statements to psychiatry resident at hospital, statements to his mother and baby's mother on night of murder, and fact that statement was mentioned only briefly during summation); *State* v. *Jordan*, supra, 314 Conn. 103–105 (admission of ecstasy pills illegally seized from defendant's closet was harmless beyond reasonable doubt with respect to his intent to sell, despite prosecutor's heavy reliance on them in closing argument, given "[the] ample additional circumstantial evidence . . . that [he] intended to sell the thirty pills he possessed on his person at the time of his arrest," including testimony from multiple witnesses that they had seen defendant sell similarly marked ecstasy pills in several locations).

In sum, we conclude that the evidence against the defendant, viewed cumulatively and in context, was overwhelmingly strong and that the admission into evidence of the contents of the cell phone did not contribute to the jury's verdict. Vanderberg's narrative of the

State *v.* Sayles

defendant's actions on the evening of the Pay Rite robbery was independently corroborated by the defendant's separate admissions of guilt to Hoover and Samuels, along with the cell site location data and the discovery of a ski mask and gloves at the defendant's residence. There was also consciousness of guilt evidence in the form of witness intimidation, insofar as Sucky assaulted Samuels in an attempt to keep him from testifying against the defendant, which Hoover testified occurred at the defendant's direction. These evidentiary underpinnings together convince us that any error in the admission of the contents of the defendant's cell phone was harmless beyond a reasonable doubt.

The judgment of the Appellate Court is affirmed.

In this opinion McDONALD, D'AURIA and MULLINS, Js., concurred.

ECKER, J., dissenting. In conducting harmless error review of a constitutional violation, it is tempting for a reviewing court to take on the role of a thirteenth juror by reconstructing a hypothetical trial at which the tainted evidence was not admitted and then asking whether the properly admitted evidence is so strong that the court can be confident that it establishes the defendant's guilt beyond a reasonable doubt. Our case law teaches that we must avoid this temptation because the inquiry asks and answers the wrong question. The correct question is whether there is a reasonable possibility that the improperly admitted evidence had a tendency to influence the judgment of the particular jury in the case before us. "The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been [returned], but whether the guilty verdict actually [returned] in *this* trial was surely unattributable to the error." (Emphasis

State *v.* Sayles

in original.) *Sullivan* v. *Louisiana*, 508 U.S. 275, 279, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993). In my view we can only answer that question "no" in the present case.

The state has not come close to providing the level of assurance required to find the alleged constitutional error harmless beyond a reasonable doubt. I base my conclusion principally on the lack of physical evidence connecting the defendant, Dwayne Sayles, to the charged crimes, the kind and quality of the state's circumstantial evidence, the highly inculpatory nature of some of the tainted evidence procured from the defendant's cell phone in presumptive violation of the prophylactic rules created by *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and *Edwards* v. *Arizona*, 451 U.S. 477, 483–85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981), and the prosecutor's heavy reliance at trial on that tainted evidence to persuade the jury of the defendant's guilt. As a result, I believe that we must reach the constitutional issues certified by this court and briefed and argued by the parties on appeal.[1]

I

LEGAL PRINCIPLES GOVERNING HARMLESS ERROR REVIEW

The error that we are presuming is of constitutional magnitude. This means that the process by which the

[1] We granted the defendant's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly uphold the trial court's denial of the defendant's motion to suppress the contents of his [cell phone] in reliance on *United States* v. *Patane*, 542 U.S. 630, 124 S. Ct. 2620, 159 L. Ed. 2d 667 (2004), and *State* v. *Mangual*, 311 Conn. 182, 85 A.3d 627 (2014), when the seizure of those contents was the result of questioning after he had invoked his *Miranda* rights, on the basis that a cell phone and its stored data constitute 'physical' (i.e., nontestimonial) evidence that need not be suppressed if seized as the result of a *Miranda* violation?" And (2) "[d]id the Appellate Court properly reject the defendant's claim that the holding in *Patane* does not comport with the broader protections against compelled self-incrimination afforded under article first, § 8, of the Connecticut constitution?" *State* v. *Sayles*, 336 Conn. 929, 247 A.3d 578 (2021). Additionally, we granted

State *v.* Sayles

defendant was convicted and sentenced to eighty years of incarceration violated our most fundamental norms of justice. Under these circumstances, the burden properly falls on the state to demonstrate that the error, despite its grave nature, nonetheless did not possibly affect the jury's verdict and, therefore, was harmless beyond a reasonable doubt. This standard is "demanding . . . ." *State* v. *Mangual*, 311 Conn. 182, 212, 85 A.3d 627 (2014). "[W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . That determination must be made in light of the entire record [including the strength of the state's case without the evidence admitted in error]." (Internal quotation marks omitted.) Id., 214–15.

Harmless error review analyzes the impact of the constitutional error on the result of the trial, rather than on whether the jury arrived at a correct finding of guilt, because the United States constitution guarantees every defendant the right to a trial by the *actual* jury convened to hear the evidence. A criminal conviction cannot be based on the verdict of a hypothetical jury. The doctrine governing constitutional harmless error review is designed with this precise principle in mind. The leading case remains *Chapman* v. *California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), which, as construed by the United States Supreme Court, prescribes the required analysis: "Consistent with the [jury trial] guarantee, the question [that *Chapman*] instructs the reviewing court to consider is not what effect the constitutional error might generally be expected to have [on] a reasonable jury, but rather what effect it had [on] the guilty

---

the defendant permission to raise on appeal a fourth amendment claim challenging the sufficiency and particularity of the search warrant used to obtain the contents of his cell phone pursuant to our recent decision in *State* v. *Smith*, 344 Conn. 229, 246–52, 278 A.3d 481 (2022).

State *v.* Sayles

verdict in the case at hand. . . . [Harmless error] review looks, [the United States Supreme Court has] said, to the basis on which the jury *actually rested* its verdict. . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been [returned], but whether the guilty verdict actually [returned] in *this* trial was surely unattributable to the error." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Sullivan* v. *Louisiana*, supra, 508 U.S. 279. Thus, "[t]he [harmless error] inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Kotteakos* v. *United States*, 328 U.S. 750, 765, 66 S. Ct. 1239, 90 L. Ed. 1557 (1946); see also *State* v. *Mangual*, supra, 311 Conn. 214 ("[W]e must examine the impact of the evidence on the trier of fact and the result of the trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.)).

It follows that harmless error review is not the same as sufficiency of the evidence review. See, e.g., *Fahy* v. *Connecticut*, 375 U.S. 85, 86–87, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963) ("We are not concerned . . . with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."); *State* v. *Bruno*, 197 Conn. 326, 336, 497 A.2d 758 (1985) (*Shea, J.*, concurring) ("Legal sufficiency of the evidence is not the test for harmless error even if only a nonconstitutional error is involved. The harmlessness of an error depends [on] its impact on the trier and the result

State *v.* Sayles

. . . .''), cert. denied, 475 U.S. 1119, 106 S. Ct. 1635, 90
L. Ed. 2d 181 (1986); see also *State* v. *Torres*, 343 Conn.
208, 245, 273 A.3d 163 (2022) (*Ecker, J.*, dissenting)
(''the legal sufficiency of the evidence is not the issue,
and the . . . marshaling of evidence sufficient to sup-
port the conviction misapprehends the point of harm-
less error analysis'').

Many courts and commentators have emphasized this
important distinction. The following words of the Flor-
ida Supreme Court summarize the point: ''The test is
not a [sufficiency of the evidence], a correct result, a
not clearly wrong, a substantial evidence, a more proba-
ble than not, a clear and convincing, or even an over-
whelming evidence test. Harmless error is not a device
for the appellate court to substitute itself for the [trier
of fact] by simply weighing the evidence. The focus is
on the effect of the error on the [trier of fact]. The
question is whether there is a reasonable possibility
that the error affected the verdict. The burden to show
the error was harmless must remain on the state. If the
appellate court cannot say beyond a reasonable doubt
that the error did not affect the verdict, then the error
is by definition harmful.'' (Emphasis omitted; internal
quotation marks omitted.) *Ventura* v. *State*, 29 So. 3d
1086, 1089–90 (Fla. 2010); see also *State* v. *Gibson*, 391
So. 2d 421, 427 (La. 1980) (''[a]lthough the [harmless
error] standard requires a reviewing court to consider
the evidence in order to determine if there is a reason-
able possibility that the error had prejudicial effect, it
does not permit a court to substitute for the verdict its
judgment of what the jury would or should have decided
in the absence of error''); *State* v. *Alvarez-Lopez*, 136
N.M. 309, 319–320, 98 P.3d 699 (2004) (''[C]onstitutional
error cannot be deemed harmless simply because there
is overwhelming evidence of the defendant's guilt. Our
focus must remain squarely on assessing the likely

State *v.* Sayles

impact of the error on the jury's verdict.''), cert. denied, 543 U.S. 1177, 125 S. Ct. 1334, 161 L. Ed. 2d 162 (2005).

In sum, the proper standard to determine whether a constitutional error is harmless does not, as the majority states, assess whether the result of the trial would have been the same *without* the admission of the presumptively improper evidence. The correct inquiry, rather, is whether we are assured beyond a reasonable doubt that the result of the trial would have been the same *despite* the admission of the presumptively improper evidence. The distinction between these two formulations is subtle but important. The former inquiry incorrectly focuses on the properly admitted evidence and the correctness of the jury's verdict, whereas the latter inquiry correctly focuses on the improperly admitted evidence and its likely impact on the jury's verdict.

II

THE TAINTED EVIDENCE AND THE STATE'S RELIANCE ON IT

The majority accurately recounts the facts that the jury reasonably could have found, and I will not repeat those facts at any length here. I consider the majority's legal analysis flawed because it alternatively understates or altogether overlooks the full extent of the tainted evidence and the prosecutor's heavy reliance on that evidence at trial. The proper analysis must begin by examining more closely the evidence extracted from the defendant's cell phone, the fruits of that evidence,[2] and the manner in which the prosecutor emphasized all of the presumptively inadmissible evidence during

---

[2] "As a general principle, the exclusionary rule bars the government from introducing at trial evidence obtained in violation of the . . . United States constitution. . . . The rule applies to evidence that is derived from unlawful government conduct, which is commonly referred to as the fruit of the poisonous tree . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Brocuglio*, 264 Conn. 778, 786, 826 A.2d 145 (2003).

State *v.* Sayles

closing and rebuttal arguments to support an inference of guilt.

The most damaging tainted evidence is the text messages extracted from the defendant's cell phone. Emanuel Hatzikostas, a digital forensic examiner with the computer analysis response team at the Federal Bureau of Investigation (FBI), testified about these text messages. According to Hatzikostas, at 3:55 a.m. on April 15, 2015, the date on which the search warrant for the residence of the defendant's mother was executed during the early morning hours, someone texted the defendant, "[d]o not come here." Approximately three hours later, at 7:48 a.m., someone texted the defendant, "M sai call his [s]hit now." On that same date, the defendant drafted the following text message, which was never sent, to an unknown recipient: "If I get locked up tell sheema put them shits in the river some where worda loc." It should come as no surprise that the content and meaning of these text messages became a focal point of the state's case.

The text messages are central to the harmlessness analysis, and I will return to them shortly, but it is important to understand at the outset that those messages were by no means the only presumptively inadmissible evidence extracted from the defendant's cell phone and presented to the jury. Multiple screenshots of a news article regarding the murder and robbery also were admitted into evidence. Specifically, the jury heard that, following the search of his mother's residence on April 15, 2015, the defendant searched the news feed of WTNH, a local New Haven news station, for information regarding the crimes for which he was on trial. On that same date, the defendant also accessed a news article on Instagram pertaining to the crimes. This tainted evidence, largely unexamined by the majority, was relied on extensively by the prosecutor during closing and rebuttal arguments to buttress the state's theory of guilt.

State *v.* Sayles

The tainted evidence also included the fact that the name associated with the defendant's cell phone was "Blackhead" and that the name associated with the Instagram account on the defendant's cell phone was "Black Hoodie," consistent with the testimony of the state's witnesses, Leighton Vanderberg, Derrick Hoover, and Jeremiah Samuels, regarding the defendant's street names. A photograph of the defendant also was among the tainted evidence, depicting him wearing white sneakers, black jeans, and a shirt emblazoned with "Born Fly As F*ck." The photograph not only portrays the defendant as proudly transgressive, using profanity to describe his nature, but, more important, shows him wearing the same color shoes and jeans worn by the perpetrator of the charged crimes.[3] This is the kind of detail that can matter to a jury.

The inadmissible contents of the defendant's cell phone yielded additional probative evidence that the prosecutor used at trial to establish the defendant's guilt.[4] The unsent text message referencing "sheema"

---

[3] The perpetrator also was wearing white sneakers and dark colored jeans.

[4] It appears that the cell site location data, which were utilized by the prosecution to track the defendant's movements on the night at issue, also are fruits of the presumed constitutional violation. The record reflects that the search warrant used to obtain the call detail records and cell site location information, like the search warrant used to obtain the contents of the defendant's cell phone, was based on information acquired as a direct and proximate result of the alleged violation of the defendant's *Miranda* rights. Specifically, the warrant recites that, "[o]n April 15, 2015, [the defendant] came to [p]olice [h]eadquarters with his mother. Prior to any questioning, [the defendant] was given his *Miranda* [r]ights from a New Haven Police Department *Miranda* [w]aiver form. [The defendant] requested an attorney and no questioning took place. Prior to [the defendant's] leaving, his mother handed to [the] detectives a [cell phone that] she said belonged to [the defendant] and provided [a certain ten digit number] as the phone number. The phone was seized and placed in an electronic protective bag to prevent remote erasure of data. A [s]earch and [s]eizure [w]arrant was obtained to retrieve data from within the [cell phone] . . . . Detectives were unable to gain access to the [cell phone] without the required passcode." Just as we are presuming in the present appeal that the defendant's cell phone and its contents should have been suppressed as fruits of the poisonous tree because the phone was obtained from the defendant's mother as a result of the alleged violation of the defendant's *Miranda* rights, so, too, must we

348 Conn. 669 MARCH, 2024 707

State *v.* Sayles

led the state to the defendant's then girlfriend, Tysheema Barker. Douglas Jowett, an inspector in the

presume that the defendant's cell phone number and the information obtained as a result of the procurement of the defendant's cell phone number must be suppressed because they were obtained from the defendant's mother in the same encounter pursuant to the same alleged *Miranda* violation. Because the information provided by the defendant's mother is the only information in the warrant that links the defendant to the cell phone number used to generate the cell site location data, and the record plainly reflects that it was obtained "by exploitation of [the alleged] illegality," it is fruit of the poisonous tree. (Internal quotation marks omitted.) *Wong Sun* v. *United States*, 371 U.S. 471, 488, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

The majority does not address the substance of my assertion that the cell site location data are fruits of the presumed constitutional violation and affords the evidence "full consideration" in its harmless error analysis on the ground that the defendant abandoned any challenge to this evidence through inadequate briefing. Footnote 8 of the majority opinion. I cannot agree for three reasons. First, the defendant's challenge to the cell site location data is subsumed within and intertwined with his claim that that the evidence obtained as a result of the violation of his *Miranda* rights improperly was admitted into evidence at trial. The police obtained his cell phone and cell phone number from his mother as the direct and proximate result of an interrogation that we presume was illegal, and precisely the same analysis applies to both. See, e.g., *Meribear Productions, Inc.* v. *Frank*, 340 Conn. 711, 732, 265 A.3d 870 (2021) ("[w]e may . . . review legal arguments that differ from those raised by the parties if they are subsumed within or intertwined with arguments related to the legal claim before the court" (internal quotation marks omitted)). Second, the burden is not on the defendant to establish that the presumed constitutional violation was harmless; the burden instead rests on the state, and the state has failed to explain why the cell site location data can be treated any differently from the cell phone itself in this respect. Cf. *State* v. *Jacques*, 332 Conn. 271, 294, 210 A.3d 533 (2019) (reversing defendant's conviction because state did not claim in its appellate brief that constitutional violation was harmless beyond reasonable doubt). Third, the overriding question that we must answer when conducting harmless error review, under any standard, is whether we have confidence in the fairness and integrity of the verdict despite the error, and answering this question requires a careful and searching review of the entire record. See, e.g., *State* v. *Mangual*, supra, 311 Conn. 214–15. Our appellate review must independently assess whether the state has met its heavy burden of establishing that a constitutional error is harmless beyond a reasonable doubt. See, e.g., *State* v. *Alexander*, 343 Conn. 495, 510, 275 A.3d 199 (2022) (conducting "our harmless error analysis . . . on the basis of our independent review of the record"). This mandate does not authorize the court to ferret out new issues unrelated to the constitutional claims raised by the defendant, but, by the same token, I do not see how our independent assessment of the entire record can treat evidence as untainted when it comes from the very same poisonous tree that rendered the defendant's cell phone and its contents inadmissible.

State *v.* Sayles

state's attorney's office, testified that he visited Barker to "[confront] her with the text message" and to serve her with a subpoena to testify at the defendant's trial. Jowett explained that Barker was "irate" and that, not long afterward, the Department of Correction notified Jowett that she had gone to visit the defendant at the New Haven Correctional Center. Barker appeared at trial pursuant to the state's subpoena and testified regarding her relationship with the defendant, the unsent text message, and her visit to the defendant at the correctional center. Barker explained that she lived with the defendant in April, 2015, and that she never saw the defendant with any guns. Barker also testified that she never received the unsent text message drafted on the defendant's cell phone and that the term "loc" refers to "somebody who passed away." According to Barker, she visited the defendant for the first time since "[a]lmost [one] year ago" because she was very upset that she had been subpoenaed to testify at his criminal trial. During that visit, she informed the defendant that she had been asked about the unsent text message on his cell phone, and the defendant replied: "You're straight. Just don't worry. They're going to try to get you mad." The defendant also said about the unsent text message something to the effect of, "[y]eah, fuck that shit. That don't mean anything . . . . You never got it. That don't mean anything." Barker acknowledged that, afterward, she and the defendant communicated nonverbally through the glass separating them during their noncontact visit so that a portion of their conversation would not be recorded by the Department of Correction. The testimony of Jowett and Barker was fruit of the presumed constitutional violation, and, as set forth in detail in this opinion, the prosecutor relied on it extensively in closing argument to urge the jury to find that the "sheema" referred to in the unsent text message was Barker and that the "shits" was the gun used in the

State *v.* Sayles

commission of the crimes with which the defendant was charged.

The state relied heavily on the tainted evidence to prove its case in a manner significantly more extensive and rhetorically persuasive than acknowledged by the majority. The prosecutor used the contents of the defendant's cell phone and the fruits of those contents during closing and rebuttal arguments not only to demonstrate the defendant's participation in the commission of the crimes but also to lend credibility to the disparate bits and pieces of the state's admissible evidence that either were unsupported, uncorroborated, or inherently suspect.

The prosecutor made strong and effective use of the most powerful piece of evidence that presumptively was admitted in violation of the defendant's constitutional rights, namely, the unsent text message on the defendant's cell phone instructing his girlfriend, Barker, to throw "them shits in the river" if he were arrested. If the jury credited the prosecutor's claim that "shits" meant "gun," an extremely plausible interpretation, then the unsent text message was the functional equivalent of a confession by the defendant. The persuasive force of this evidence was obvious, as the prosecutor pointedly highlighted for the jury during initial closing argument: "You heard from FBI analyst . . . Hatzikostas. . . . Hatzikostas testified that he was able to analyze a [cell] phone belonging to the defendant. If you recall, it had the [defendant's] name . . . on it, Blackhead. He was able to retrieve a series of text messages from April 15, 2015. Now, if you recall, there is testimony that, in the early hours of April 15, [at] approximately 3 a.m., [the] New Haven Police Department executed a search warrant . . . [at] the defendant's residence. In the series of text messages that [was] presented, there's a text message that was received by the defendant's phone at 3:55 a.m. on April 15, 2015, that says, '[d]o not come here.' There was also testimony that,

State *v.* Sayles

later that day, the same day, April 15, 2015, the defendant and his mother went to the New Haven Police Department to talk to detectives about why they were at . . . his house. In the same string of text messages, there's a text message that . . . was not sent, although . . . Hatzikostas said there were numerous reasons why a text message may not be sent. Maybe [the cell phone] lost contact with the server, but there's a text message that was typed on the defendant's [cell] phone, '[i]f I get locked up tell sheema put them shits in the river some where [worda loc].''[5]

The prosecutor also emphasized the significance of the unsent text message by tying the gun (the "shits") allegedly referenced in that message to the testimony of other witnesses, with the effect of providing a mutually reinforcing narrative. The prosecutor explained to the jury that Barker testified that "she also goes by the name Sheema. . . . She testified that, after [one] year of not going to visit . . . the defendant in jail, after she was served with a subpoena by . . . Jowett . . . she went to go visit him on January 27, 2018, a little [more than one] week ago. She testified that she knows those telephone calls while you're in a face-to-face visit are recorded. She also testified that, when they want to talk about things that they don't want recorded, they put the phone down and talk through the glass. She told you that she told the defendant that . . . Jowett had come to see her and that . . . Jowett ha[d] asked her about the text message, '[i]f I get locked up tell sheema . . . put them shits in the river' or to lie. The defendant at that point told her not to worry." The inference was both obvious and compelling: the suspi-

---

[5] Defense counsel also referred to the unsent text message in his closing argument, stating, "[t]his text message [about] the shits . . . could mean anything. They want you to think, oh, it was guns, right? That's what they want you to think. Who knows, right? It could be drugs. It could be stolen property. It could be anything. It doesn't have to be guns. You don't have to believe this because they say it. And [the unsent text message] never even gets sent."

State *v.* Sayles

cious and secretive communications between Barker and the defendant at the correctional center were further evidence that the unsent text message meant exactly what the prosecutor suggested it meant.

Similarly, the prosecutor reminded the jury that there was evidence from both Samuels and Hoover that the defendant had stashed the gun used in the commission of the crimes at Barker's residence. The prosecutor referenced Samuels' prior inconsistent statement to the police, which was admitted into evidence for substantive purposes under *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), "that the defendant had a girlfriend by the name of Tysheema, that he had a baby's mother by the name of Imani, and that the guns were probably at either one of those locations." The prosecutor later referenced Hoover's testimony that "[t]he defendant told . . . Hoover that the guns were at [the defendant's] girlfriend's house [and] that, after the police raided his house, he moved them." On the basis of this testimony, the prosecutor simultaneously tied together disparate threads of evidence and bolstered the credibility of the jailhouse informants by implicitly but unmistakably suggesting to the jury that the "shits" mentioned in the defendant's unsent text message referred to the gun used in the commission of the crimes, consistent with the statement of Samuels and the testimony of Hoover.

The prosecutor continued to hammer home the significance of the tainted evidence during rebuttal argument to construct a compelling narrative of guilt. In one instance, the prosecutor argued that "April 15 is kind of an interesting time frame because . . . Vanderberg goes down April 14, he gives the information to [the] police, and then everything starts rolling. . . . The next day, the defendant [was] on the WTNH app . . . looking up the story. Pretty coincidental. And he's looking

State *v.* Sayles

up this story when he's got nothing to do with it? He's so concerned that he's reading details in the afternoon time on April 15 about this Forbes [Avenue] gas station and homicide. . . . He got a series of texts, right? . . . And what were those texts? . . . [H]e got the first one right around the time the police [were] actually tossing his house, from someone to [the defendant], '[d]o not come here.' Later that day, a text [message] that we know was never sent, but it was drafted on that phone, '[i]f I get locked up tell sheema put them shits in the river some where [worda loc].' Shits can mean anything, right? People are constantly throwing stuff in the river. Does that make sense, or does it make more sense that he keeps his gun at his girlfriend's house? He knows he's going to get locked up for this offense, and he's desperately trying to get the word out to get rid of those guns."

The prosecutor continued: "How about the conversation with Sheema? They're talking about the text message. She had met with . . . Jowett a couple [of] days earlier. Of course, she hasn't seen [the defendant] in over [one] year, but she decides to go and pay him a visit days before she gets on the stand. And he says, '[t]hat don't mean nothing. You never got it. That don't mean nothing.' He's not worried at all. What's he referring to? Is he referring to the guns? Is he referring to the text message? I don't know. It certainly shows knowledge of something though, doesn't it?"

The record, in short, establishes without question that the prosecutor's use of the tainted evidence was extensive, integral to the state's theory of guilt, and rhetorically effective.

### III

### HARMLESS ERROR ANALYSIS

Applying the proper standard of review, I cannot conclude on this record that the presumed constitutional

State *v.* Sayles

error is harmless beyond a reasonable doubt. The inculpatory nature of the tainted evidence strikes me as self-evident. The timing of the text messages and the defendant's searches for news articles was highly suspicious because they occurred on the same day and around the same time that his mother's residence was being searched for evidence of the murder and robbery with which the defendant eventually was charged. The jury heard that, at the time the search warrant was executed at his mother's residence, someone texted the defendant "[d]o not come here." Additionally, soon thereafter, the defendant searched the WTNH news app and Instagram for information regarding the very crimes at issue. Even more damning is the unsent text message: "If I get locked up tell sheema put them shits in the river some where worda loc." It is irrelevant to the analysis that this text message never was sent—the important point is that the message reflects the defendant's own acknowledgment that he might get "locked up," i.e., arrested, presumably for the crimes for which his mother's residence was searched and for which he was soon to be charged. The jury readily could have inferred, as the prosecutor plainly argued, that the unsent text message captures the defendant himself acknowledging that there is inculpatory evidence of his participation in those crimes, namely, the "shits" that the defendant tells his girlfriend to throw into the river.

This is strong evidence of guilt by any standard. The prosecutor knew that it was powerful and deployed it accordingly. The prosecutor invited the jury to infer that the word "shits" in the unsent text message referred to the gun used in the commission of the murder and robbery, which never was recovered. She implored the jurors to use their common sense and to find that there was no innocent explanation for the text: "Shits can mean anything, right? People are constantly throwing stuff in the river. Does that make sense, or does it make

more sense that he keeps his gun at his girlfriend's house? He knows he's going to get locked up for this offense, and he's desperately trying to get the word out to get rid of those guns.'' The prosecutor expressed even greater incredulity that there could be an innocent explanation for the defendant's Internet searches for news of the crimes: ''The next day, the defendant [was] on the WTNH app . . . looking up the story. Pretty coincidental. And he's looking up this story when he's got nothing to do with it? He's so concerned that he's reading details in the afternoon time on April 15, about this Forbes [Avenue] gas station and homicide.'' The prosecutor also suggested to the jury that an innocent man, one unconnected to the crimes with which the defendant was charged, would not be instructed ''[d]o not come here'' during the execution of a search warrant. These are good arguments, and I cannot imagine being confident that they had no tendency to persuade the jury to reach a guilty verdict.

The other evidence extracted from the defendant's cell phone led directly to additional inculpatory evidence, which the prosecutor used to strengthen the case against the defendant. The jury heard that the unsent text message led the state to Barker, who, after being confronted with the text message, visited the defendant for the first time in approximately one year. According to Barker, the defendant was unconcerned about the unsent text message, purportedly saying to Barker: ''Yeah, fuck that shit. That don't mean anything . . . . You never got it. That don't mean anything.'' Through questioning and argument, the prosecutor used the inculpatory nature of the text message to suggest to the jury that Barker and the defendant continued their cover-up when the defendant and Barker intentionally communicated nonverbally so that their conversation would not be overheard by the Department of Correction: ''How about the conversation with Sheema?

State *v.* Sayles

They're talking about the text message. She had met
with . . . Jowett a couple [of] days earlier. Of course,
she hasn't seen [the defendant] in over [one] year, but
she decides to go and pay him a visit days before she
gets on the stand. And he says, '[t]hat don't mean noth-
ing. You never got it. That don't mean nothing.' He's
not worried at all. What's he referring to? Is he referring
to the guns? Is he referring to the text message? I don't
know. It certainly shows knowledge of something though,
doesn't it?''

The prosecutor appealed to the jurors to use their
common sense and experience to find that the defen-
dant's text messages, searches for news articles, and
conversation with Barker reflected the defendant's guilt
and an attempt to cover up his commission of the
crimes. This would have been entirely appropriate advo-
cacy if the evidence had been admissible. See, e.g., *State*
v. *Courtney G.*, 339 Conn. 328, 347, 260 A.3d 1152 (2021)
(prosecutor is permitted to ''appeal to [the jurors'] com-
mon sense in closing remarks'' (internal quotation
marks omitted)). But we are presuming in the present
appeal that the evidence was improperly admitted in
violation of the defendant's constitutional rights, as
guaranteed by *Miranda* v. *Arizona*, supra, 384 U.S.
478–79, and *Edwards* v. *Arizona*, supra, 451 U.S. 483–
85. The prosecutor's pointed and repeated reliance on
the tainted evidence during closing and rebuttal argu-
ments undermines the majority's conclusion that the
admission of this evidence was harmless beyond a rea-
sonable doubt.

We previously have observed that a prosecutor's ''fre-
quent and repeated emphasis on [inadmissible evidence]
during [his or her] closing and rebuttal arguments indi-
cates that [its] admission was not harmless.'' *State* v.
*Culbreath*, 340 Conn. 167, 195, 263 A.3d 350 (2021); see
also *State* v. *Ayala*, 333 Conn. 225, 235, 215 A.3d 116
(2019) (''in evaluating harm [we] look to see how the

State *v.* Sayles

state used [the inadmissible] evidence in its closing argument''); *State* v. *Sawyer*, 279 Conn. 331, 360–61, 904 A.2d 101 (2006) (finding harm because, among other reasons, state repeatedly emphasized improperly admitted evidence during its closing argument), overruled in part on other grounds by *State* v. *DeJesus*, 288 Conn. 418, 953 A.2d 45 (2008). Although we have not explicitly articulated our rationale for this principle, the logic is unmistakable. The prosecutor's own selection of evidence to use during closing and rebuttal arguments at trial, chosen specifically for the purpose of persuading the jury of the defendant's guilt, is among the very best indicators of what evidence would have had a tendency to impact the jury's assessment of guilt. Why, after all, would the prosecutor repeatedly emphasize the contents of the defendant's cell phone to persuade the jury of his guilt if that evidence was trivial, inconsequential, equivocal, or immaterial? If we are attempting to reconstruct what evidence reasonably was relied on by *this* jury to arrive at its verdict, and if our inquiry must strive (as much as possible) to avoid the risk of retrospective appellate hypothesizing, I would think that the state would have great difficulty meeting its burden of demonstrating harmlessness on appeal when, as here, the particular evidence that it now seeks to characterize as having had no tendency to persuade the jury was, in fact, evidence handpicked by the prosecutor precisely for its persuasive force at trial and explicitly and repeatedly relied on by the prosecutor to convince the jury of the defendant's guilt.

The majority's failure to adequately consider the effect that the prosecutor's heavy reliance on the improperly admitted evidence likely had on the jury marks a departure from our usual harmless error analysis. Rather than examine what the prosecutor said and the likely impact it had on the jury, the majority focuses on the number of impermissible arguments in comparison to

State *v.* Sayles

the permissible arguments, concluding that, "[v]iewed in context . . . the prosecutor's focus on the unsent text message was minimal relative to the other evidence admitted at trial."

This analysis is flawed for two reasons. First, even if I were to accept the suggestion that the harmlessness analysis focuses on the relative quantity of references to the tainted evidence vis-à-vis the untainted evidence, and even if numerous references to the tainted evidence throughout the prosecutor's arguments could be considered insubstantial—both flatly erroneous propositions in my view—the tainted evidence in this case was far more extensive than just the unsent text message. It also included all of the other evidence found on the defendant's cell phone and the fruits of the constitutional violation, such as the defendant's searches for news articles regarding the crimes of conviction, the text message sent to him when his mother's residence was being searched ("[d]o not come here"), and Barker's testimony about her off-the-record conversation with the defendant regarding the unsent text message at the correctional center. The prosecutor relied on all of this evidence, at length, during her closing and rebuttal arguments. Indeed, it is fair to say that the tainted evidence pervaded the prosecutor's closing and rebuttal arguments.

Second, regardless of the number of references, when examining the likely effect that inadmissible evidence had on the jury, our review must be qualitative, not quantitative. See, e.g., *State* v. *Van Kirk*, 306 Mont. 215, 224, 32 P.3d 735 (2001) (when conducting harmless error review, appellate courts cannot "simply tally the *quantity* of the admissible evidence of guilt, [but] instead [must] evaluat[e] the *qualitative* impact the inadmissible evidence might have had on the finder of fact" (emphasis in original)). That is to say, we must examine the quality and nature of the improperly admitted evi-

State *v.* Sayles

dence in relation to the other evidence adduced at trial and carefully assess the manner in which the prosecutor highlighted that evidence to the jury and encouraged the jury to rely on it to find the defendant guilty. In my view, the inculpatory nature of the inadmissible evidence combined with the prosecutor's pointed and repeated references to that evidence during closing and rebuttal arguments demonstrate why the state cannot meet its burden of proving harmlessness beyond a reasonable doubt.[6]

Even in the strongest of cases, it would be difficult to conclude that such damaging evidence had no possible tendency to affect the jury's verdict. And this is not the strongest of cases. There was no physical evidence connecting the defendant to the crimes. For example, there were no impartial eyewitnesses who identified the defendant as a participant, there was no forensic or DNA evidence placing the defendant at the scene of the crimes, and there was no ballistic evidence connect-

---

[6] I agree with the majority that a prosecutor's reliance on illegally obtained evidence in closing argument is not dispositive, but I find the cases cited by the majority to be distinguishable because, in those cases, the tainted evidence paled in comparison to the strength and quality of the properly admitted evidence, such that we could say beyond a reasonable doubt that the result of the trial would have been the same despite the admission of the tainted evidence and the prosecutor's reliance on it. See, e.g., *State* v. *Tony M.*, 332 Conn. 810, 823–25, 213 A.3d 1128 (2019) (improper admission of defendant's statement that he tossed infant son off bridge in manner similar to " 'free throw' " was harmless beyond reasonable doubt as to defendant's intent in light of defendant's numerous text messages detailing his intent and testimony from multiple witnesses); *State* v. *Jordan*, 314 Conn. 89, 104, 101 A.3d 179 (2014) (improper admission of evidence of drugs found in closet was harmless beyond reasonable doubt as to issue of intent to sell because number of pills found on defendant's person, combined with fact that these pills "contained identical markings to pills [the defendant] previously had sold, [was] consistent with a drug dealer soliciting repeat business"). Importantly, in the cases relied on by the majority, the remaining evidence of guilt did not derive predominantly from "[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals [that] are 'dirty business' [and] may raise serious questions of credibility." *On Lee* v. *United States*, 343 U.S. 747, 757, 72 S. Ct. 967, 96 L. Ed. 1270 (1952).

State *v.* Sayles

ing the defendant to the gun used in the commission of the crimes.

The admissible evidence of the defendant's guilt was derived predominantly from the testimony of convicted felons (Vanderberg, Hoover, and Samuels), jailhouse informants (Hoover and Samuels), and the defendant's accomplice (Vanderberg). Although each of these witnesses implicated the defendant in the charged crimes, they suffered from serious credibility problems and had a powerful incentive, fueled by self-interest, to falsely implicate the defendant in the crimes charged. See, e.g., *State* v. *Jones*, 337 Conn. 486, 496, 254 A.3d 239 (2020) (Jailhouse informants have "a powerful incentive, fueled by self-interest, to implicate falsely the accused. Consequently, the testimony of such an informant . . . is inevitably suspect." (Internal quotation marks omitted.)); *State* v. *Patterson*, 276 Conn. 452, 469, 886 A.2d 777 (2005) ("[a]s the United States Supreme Court observed . . . '[t]he use of informers, accessories, accomplices, false friends, or any of the other betrayals which are "dirty business" may raise serious questions of credibility' "), quoting *On Lee* v. *United States*, 343 U.S. 747, 757, 72 S. Ct. 967, 96 L. Ed. 1270 (1952). The testimony of jailhouse informants and accomplices regarding a defendant's allegedly inculpatory admissions is inherently suspect, particularly damaging, and has a significant influence on conviction rates. See *State* v. *Jones*, supra, 502 ("false confession evidence from informants is *the* leading factor associated with wrongful convictions in capital cases and a major factor contributing to wrongful convictions in noncapital cases" (emphasis in original; internal quotation marks omitted); J. Neuschatz et al., "The Effects of Accomplice Witnesses and Jailhouse Informants on Jury Decision Making," 32 Law & Hum. Behav. 137, 146 (2008) ("the presence of a secondary confession provided by a cooperating witness ha[s] a strong influence on conviction

State *v.* Sayles

rates when compared with the absence of such testi-
mony''). For this reason, the jury in the present case
was instructed to ''look with particular care at the testi-
mony of'' these witnesses and to ''scrutinize it very
carefully before . . . accept[ing] it.''

The credibility of these witnesses plainly was important
to the state's case, and any evidence that tended to
bolster their credibility likely would have affected the
jury's verdict. See *State* v. *Fernando V.*, 331 Conn. 201,
223–24, 202 A.3d 350 (2019) (''[when] credibility is an
issue and, thus, the jury's assessment of who is telling
the truth is critical, an error affecting the jury's ability
to assess a [witness'] credibility is not harmless error''
(internal quotation marks omitted)). The tainted evi-
dence did just that—it corroborated the testimony of
Vanderberg and Hoover that the defendant was involved
in the commission of the crimes charged and tended
to support their testimony that he hid the murder
weapon at the home of his girlfriend. Given ''[t]he com-
monsense inference that corroborated statements tend
to be true,'' the inadmissible evidence necessarily enhanced
the credibility of these crucial witnesses. *State* v. *Fauci*,
282 Conn. 23, 40, 917 A.2d 978 (2007).

Further compounding the harm to the defendant is
the fact that the accuracy and believability of the evi-
dence from the defendant's cell phone—particularly the
unsent text message, ''[i]f I get locked up tell sheema
put them shits in the river some where worda loc''—
could not seriously be doubted once heard by the jury.
The jury could not easily discount this evidence as self-
serving, mistaken, or unreliable because, after all, it
came from the defendant himself. See *Zappulla* v. *New
York*, 391 F.3d 462, 473 (2d Cir. 2004) (inculpatory
admissions from defendant are ''the most probative and
damaging evidence that can be admitted against him''
because they ''come from the actor himself, the most
knowledgeable and unimpeachable source of informa-

State *v.* Sayles

tion about his past conduct'' (internal quotation marks omitted)), cert. denied, 546 U.S. 957, 126 S. Ct. 472, 163 L. Ed. 2d 358 (2005). Together, the tainted evidence and the testimony of Vanderberg, Hoover, and Samuels had a synergistic effect, which reinforced the state's theory of guilt and likely affected the outcome of the jury's verdict.

The majority acknowledges "that the testimony of Vanderberg and Hoover is properly viewed with some skepticism, given their obvious self-interest in testifying for the state as an accomplice and a jailhouse informant, respectively,'' but finds this evidence to be compelling in large part because the testimony of each was corroborated by the testimony of the other and the prior inconsistent statement of Samuels, another jailhouse informant. I cannot agree with the majority that the suspect testimony of a jailhouse informant "grow[s] in strength considerably'' simply because it is repeated by another jailhouse informant or accomplice. In determining whether independent corroboration exists in the context of harmless error review, we must exercise care that we do not abandon our well justified skepticism about the untrustworthy nature of testimony provided by accomplices and jailhouse informants. The untrustworthy nature of this testimony exists because these witnesses have a powerful incentive, animated by self-interest, to falsely implicate the defendant in the crimes charged. I fail to understand how this powerful incentive is eliminated or even reduced by the fact that multiple witnesses all share the same motivation. Indeed, some states will not even permit the testimony of accomplices or jailhouse informants to come into evidence without corroboration by a source other than another accomplice or jailhouse informant. See, e.g., *State* v. *Harris*, 405 N.W.2d 224, 227 (Minn. 1987) ("[a]ccomplice testimony, it is clear, may not be corroborated solely by the testimony of another accomplice''); *People* v. *Ohlstein*,

State *v.* Sayles

54 App. Div. 2d 109, 112, 387 N.Y.S. 2d 860 (1976) ("[t]es-
timony of each of several accomplices is not corrobora-
tive of the other"), aff'd, 44 N.Y.2d 896, 379 N.E.2d 222,
407 N.Y.S.2d 696 (1978); *Chapman* v. *State*, 470 S.W.2d
656, 660 (Tex. Crim. App. 1971) ("it is a fundamental
principle that the testimony of one accomplice witness
cannot corroborate another accomplice witness' testi-
mony"); see also *Schnidt* v. *State*, 357 S.W.3d 845, 851
(Tex. App. 2012, pet. ref'd) (standard for corroboration
of accomplice and jailhouse informant testimony is
same, and one cannot corroborate the testimony of other).[7]

We need not go so far in the present case, which
does not involve the admissibility or sufficiency of evi-
dence but, rather, the different question of whether the
evidence demonstrates the harmlessness of the pre-
sumed constitutional error beyond a reasonable doubt.
The inherently dubious testimony of accomplices or
jailhouse informants and accomplices simply cannot
supply what the majority characterizes as "overwhelm-
ing" evidence of guilt; nor is it sufficiently strong to
remove the taint of the improper admission of the defen-
dant's cell phone and its contents. To the extent that
the jury found the testimony of Vanderberg, Hoover,
and Samuels credible, I consider it most likely that they
were persuaded to believe this testimony only because

_____

[7] The majority contends that my reliance on *State* v. *Harris*, supra, 405 N.W.2d
227, *People* v. *Ohlstein*, supra, 54 App. Div. 2d 112, *Chapman* v. *State*, supra,
470 S.W.2d 660, and *Schnidt* v. *State*, supra, 357 S.W.3d 851, is misplaced
because Connecticut has not adopted a corroboration rule for the testimony
of accomplices and jailhouse informants. See footnote 10 of the majority opinion.
The majority misapprehends my point. I do not intend to suggest that indepen-
dent corroboration of accomplice and jailhouse testimony is necessary to adduce
sufficient evidence of a criminal defendant's guilt. As I previously explained,
sufficiency of the evidence review is distinct from harmless error review, and
the two types of appellate review should not be conflated. My argument, which
the majority does not refute, is that the testimony of accomplices and jailhouse
informants is inherently suspect and, absent objectively verifiable substantiation,
is inadequate in the present case to satisfy the state's burden of establishing that
the presumed constitutional violation is harmless beyond a reasonable doubt.

State *v.* Sayles

it was corroborated by the highly inculpatory contents of the defendant's own cell phone, which the defendant could not explain away. This is the very definition of harmful error.

The cell site location data, which the majority characterizes as "the most powerful evidence corroborating the testimony of Hoover and Vanderberg," appears to be fruit of the poisonous tree because the warrant used to procure that data was based on information obtained as a direct and proximate result of the presumed constitutional violation. See footnote 4 of this opinion. Regardless, even if we were we to include the cell site location data in the harmless error analysis, it did not establish any of the essential elements of the crimes charged or that the defendant was in the actual location of the murder and robbery when those crimes occurred. At most, this evidence established that the defendant was in the general vicinity of the Forbes Avenue gas station approximately seventeen minutes beforehand. The defendant's location at 7:33 p.m., the approximate time of the murder and robbery, is unknown. Indeed, the cell site location data indicate that the defendant was moving in and around the city during the one and one-half hours between 7:00 and 8:30 p.m. At 7:15 p.m., he was in the Long Wharf area of New Haven, but, one minute later, at 7:16 p.m., he was across the Quinnipiac River in the area where the gas station on Forbes Avenue was located. More than one hour later, at 8:29 p.m., he was again across the Quinnipiac River in the area of New Haven where his mother's residence was located. His movements between 7:16 and 8:29 p.m. are unclear, but what is clear is that the cell site location data do not disclose the defendant's precise location at the time of the crimes charged. Moreover, given that the defendant's cell phone pinged on two different cell towers in two separate areas of New Haven within less than two minutes, it is reasonable to infer that the defendant

State *v.* Sayles

was moving around the city at the time and could have traveled a considerable distance in the seventeen minute time period between 7:16 and 7:33 p.m. It may be equally reasonable to infer that the defendant's movements remained static during this time period and that he was in the vicinity of Forbes Avenue when the crimes occurred, but, under any scenario, the defendant's presence in the general area of the crime is hardly powerful evidence of guilt because the imprecision of the cell site location data and the dense population of the city would at best make him one of countless potential suspects.

The testimony of the impartial eyewitness, Jonathan Gavilanes, who observed two men fleeing the scene of the crime, does nothing to remove the doubt surrounding the state's case. Gavilanes did not identify the defendant as one of the men and was unable to provide a detailed description of the perpetrators, aside from their clothing and height. As to their height, Gavilanes' testimony was equivocal. Gavilanes, who is six feet tall, described the perpetrators' height as "[a]bout five feet, seven inches [tall], almost my height."[8] On cross-examination, Gavilanes acknowledged that there is "a big difference between five foot, seven inches, and six feet," and reiterated that the perpetrators were about his own height—six feet. On redirect examination, Gavilanes testified that he was "guessing" that the perpetrators were about five feet, seven inches tall. Given the inconsistent nature of Gavilanes' testimony and the fact that the average height of all men is between five feet, seven inches, and six feet tall, his description adds no strength to the state's case.

I likewise see no significant force added to the state's case by the black ski mask and gloves found in the residence of the defendant's mother. There was DNA

---

[8] The defendant is five feet, seven inches tall.

State *v.* Sayles

evidence indicating that the defendant was a possible contributor—as were one out of every five other African Americans in the population. The majority candidly acknowledges the tenuous connection between the ski mask and gloves and the defendant, stating that "the DNA evidence standing alone is far from definitive . . . . " I agree with that assessment. The connection between the black ski mask and gloves and the crimes charged is even weaker. There was nothing distinctive about the black ski mask and gloves used in the murder and robbery—no unique markings, patterns, or colors—to distinguish those items from the type or color of ski masks and gloves commonly found in a typical Connecticut household. There is nothing unusual or inherently inculpatory in possessing a black ski mask and gloves. Given Connecticut's cold winters, countless residents of this state have these items in their closets. Absent some evidence connecting the black ski mask and gloves found in the residence of the defendant's mother with the black ski mask and gloves used in the commission of the crimes, I cannot conclude that this evidence constitutes physical evidence connecting the defendant to the murder and robbery.

For the foregoing reasons, the properly admitted evidence was of a circumstantial nature and dubious or imprecise quality that does not come close to the kind of evidentiary showing that would remove or diminish the harmful effect that the improperly admitted evidence likely had on the jury's verdict in the present case. Accordingly, I cannot conclude, beyond a reasonable doubt, that the alleged constitutional violation was harmless. I am not any more eager than the majority to reach the constitutional issues analyzed by the Appellate Court, certified by this court, and briefed and argued by the parties on appeal, but I do not believe that we can dispose of this case on the ground of harmless error. The defendant has a constitutional right to have a duly constituted jury deter-

State *v.* Sayles

mine his guilt on the basis of lawfully obtained evidence. Absent waiver of this right, only a jury, not a panel of judges, can find the defendant guilty of the crimes charged beyond a reasonable doubt. As a result of this fundamental mandate, when an error of constitutional magnitude occurs at trial, the defendant is entitled to a new jury trial unless a reviewing court can say beyond a reasonable doubt that the error did not have a tendency to influence the jury's verdict. I cannot reach that conclusion on this record, and, accordingly, I respectfully dissent.